[No. S024642. Jan. 27, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL RAY BURGENER, Defendant and Appellant.

## COUNSEL

Michael R. Totaro and Stephen S. Buckley, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Frederick R. Millar, Jr., Raquel M. Gonzalez and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—On Halloween morning 1980, defendant Michael Ray Burgener killed William Arias, a convenience store clerk, and emptied the store's cash register of approximately $50. In 1981, a jury convicted defendant of first degree murder by use of a firearm (Pen. Code, §§ 187, 189, 12022.5),[1] robbery by use of a firearm and with the infliction of great bodily injury (§§ 211, 12022.5, 12022.7), and being a felon in possession of a firearm (§ 12021). The jury also found true the special circumstance that

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

defendant murdered Arias in the commission of the robbery (§ 190.2, former subd. (a)(17)(i) [now § 190.2, subd. (a)(17)(A)]) and sentenced defendant to death. In 1986, we affirmed the guilt judgment but reversed the penalty because defense counsel, at defendant's instruction, had not presented any mitigating evidence or argument. (*People v. Burgener* (1986) 41 Cal.3d 505, 542-543 [224 Cal.Rptr. 112, 714 P.2d 1251].)

In 1988, a jury again sentenced defendant to death. However, the trial court acted under section 190.4, subdivision (e) to modify the verdict from death to life without the possibility of parole. The Court of Appeal reversed, finding the trial court had considered improper factors in modifying the verdict, and remanded with directions for the trial court "to reconsider and rule upon the motion in accordance with the factors listed in Penal Code sections 190.4, subdivision (e), and 190.3 and no others." (*People v. Burgener* (1990) 223 Cal.App.3d 427, 430 [272 Cal.Rptr. 830].)

Because the penalty retrial judge had retired, the case was reassigned. The substituted judge, after reading the entire penalty retrial transcript, denied the application to modify the verdict. This appeal is automatic. (§ 1239, subd. (b).)

Except for the standard of review applied by the substitute judge who heard the section 190.4, subdivision (e) application, we find no error and therefore vacate the judgment of death solely to permit the judge to reconsider the automatic application to modify the verdict under the correct standard.

FACTS

The prosecution's case-in-chief at the penalty retrial included an abbreviated version of the guilt phase evidence describing the circumstances of the murder and robbery. We review those facts briefly. (See *People v. Burgener, supra,* 41 Cal.3d at pp. 512-515.)

Shortly after 4:00 a.m. on October 31, 1980, Christine Boyd stopped by the 7-Eleven on Rutland Avenue in Riverside for her morning cup of coffee on her way to work. From her car, she noticed the store's clerk, William Arias, was not behind the counter. A White male with shoulder-length, curly brown hair and wearing a cowboy hat left the store with a paper sack. Boyd entered the store to find Arias "all bloody." She called the police.

Riverside Police Officer Gregg Dunn arrived at 4:14 a.m. Arias told the officer, "He shot me. He shot me four or five times, in the face, in the

stomach and in the back," then began to lose consciousness. Around $50 was missing from the cash register.

Arias died from loss of blood caused by bullet wounds. He had been shot five times with a .22-caliber weapon. Gunpowder residue on his face indicated he had been shot from a distance of about 12 inches. He had no offensive or defensive wounds.

When defendant was arrested approximately 12 hours later, he had long, curly brown hair and was wearing a cowboy hat that looked like the hat Boyd had seen on the man leaving the 7-Eleven store. He also had a .22-caliber handgun. According to the criminalist, expended bullets and bullet fragments recovered from the crime scene could have come from defendant's weapon. The sole of defendant's left shoe produced a weak positive under a Hemastix test, which is used as a presumptive test to detect the presence of blood. There was insufficient material to perform any other test to confirm the substance as blood.

A crumpled 7-Eleven paper bag with two $5 bills stuck in the wrinkles was found in the trash can at the apartment where defendant had spent the night. A small bag of .22-caliber ammunition was found in the common bathroom at the apartment complex four days later. This cache of bullets matched the bullet fragments recovered from Arias's body in their elemental composition and could have come from the same melt of lead.

*Evidence Offered to Show Lingering Doubt*

Defendant denied committing the murder and being present at the scene. The defense instead contended that prosecution witnesses Joseph DeYoung and Nola Jane England had framed defendant for Arias's murder. Although England was engaged to defendant, she had previously been romantically involved with DeYoung. DeYoung's interest in England persisted even though she tried to discourage him. Defendant suspected that DeYoung was jealous of him, and DeYoung admitted he was.

Defendant claimed he had been asleep at England's apartment at the time of the murder. A few hours before the murder, defendant and England had gone to the hospital to seek treatment for defendant's injured finger. Defendant's finger was bandaged and placed in a metal splint, and he was given some pain pills. When they arrived at England's apartment around 2:00 a.m., defendant took three or four Valium tablets, which put him to sleep. Defendant claimed he did not wake up until after 6:00 a.m.

England, however, testified that defendant woke her up around 5:00 a.m. He was fully dressed and emptied money out of a paper bag onto the bed. He

said that he had robbed a convenience store because they needed money and that he had shot the clerk in self-defense.

Defendant and England each testified that they picked up DeYoung around 8:00 a.m. to arrange a purchase of methamphetamine and then went to Bob's Big Boy. Defendant left a short time later to meet with his parole officer,[2] while England and DeYoung remained at the restaurant. After defendant left, England told DeYoung that defendant had robbed and murdered a convenience store clerk. She said she wanted to exchange the gun, which she had bought from DeYoung earlier that month, so that defendant would not be caught with it. Although England did not say so, DeYoung assumed that England had been in the car during the robbery and murder. DeYoung said he would arrange a trade in the afternoon and excused himself from the table.

DeYoung went to a pay phone and called Detective Pete Harding. DeYoung had offered Harding information on previous occasions in exchange for reduction or dismissal of criminal charges. Although DeYoung was unable to get in touch with Harding at that point, he was later able to tell Harding about the crimes and arrange for Harding to make the arrest. The plan was for defendant and England to meet DeYoung near a liquor store to execute the gun exchange. The police would then show up instead of DeYoung.

Defendant said he had been unaware of any discussion about exchanging guns until the afternoon. He admitted England had earlier obtained a .22-caliber gun for his protection but said the gun was kept buried under a tree next to England's apartment because he was on parole and England did not have a license for it. He was surprised that morning when DeYoung handed him the weapon, since the last time he had seen it was when he buried it two weeks earlier. Defendant said he reburied the gun between 10:00 a.m. and noon, but England almost immediately dug it back up. She said DeYoung wanted it back and had offered to replace it with another weapon.

England disputed defendant's testimony on this point. She testified that defendant had the gun when he returned from the convenience store and had buried it under a tree next to her apartment before they even picked up DeYoung. DeYoung, too, denied ever borrowing the gun and denied handing the gun to defendant that morning.

In the afternoon, DeYoung telephoned England to arrange an exchange of guns. Defendant, who was carrying the .22-caliber handgun, and England

---

[2]Defendant told his parole officer he had gone to the hospital at 4:00 a.m.—the same time as the robbery and murder.

arrived at the meeting place and were arrested. Defendant told Detective Harding, "I suppose you didn't see the guy I just bought it from. If you have been watching me, if you've been watching me for a few minutes . . . then you would have seen the guy I just bought it from. . . . [Y]ou should have been able to see the other guy. . . . You can't put that gun on me." When defendant was informed he was under arrest for the robbery murder, he denied any involvement and said Harding would be surprised when he found out that someone "familiar" to him was actually responsible. Defendant denied making these statements to Harding.

During her initial police interview, England denied any knowledge of the robbery or murder and said defendant had been with her the entire night. England even offered to take a polygraph so long as she did not have to answer questions about defendant's involvement. When the police threatened to charge her with perjury and take her children away, she eventually revealed what defendant had told her. England then regretted telling the police what defendant had said about the robbery and murder and tried to make amends by writing defendant a letter she hoped would be read by the sheriff's department. The letter said they should not "take the rap" for something DeYoung did.

Meanwhile, defendant told Sergeant Richard Zavetz of the Riverside County Sheriff's Department that he had waited for England to go to sleep and had then driven DeYoung to the 7-Eleven. He was still in the car when DeYoung shot Arias. Defendant initially said that *he* was wearing the cowboy hat but, after learning there had been an eyewitness, claimed DeYoung had worn the cowboy hat and had exited the store with the money in a paper bag. Defendant also said he took the gun back from DeYoung immediately after the crime.

At trial, defendant disavowed this account. He justified the lie by claiming he had been desperate and felt he was going to "take the fall" for the crimes anyway. He hoped that DeYoung, who had set him up, would also be arrested.

In December 1980, England (assisted by DeYoung) overdosed on heroin and Valium and went into a coma because she did not want to testify against defendant, with whom she was still in love. England also made a taped statement in front of defendant's parents and some other people at defendant's church to announce that defendant was not guilty and that she had been coerced by police to implicate defendant, but the tape apparently disappeared. England felt pressure from defendant's family to make these untrue statements denying defendant's involvement. At defendant's first trial, she

tried to help defendant (without committing perjury) by falsely claiming a lack of memory and suggesting DeYoung was involved.

The defense also attacked DeYoung's and England's credibility. DeYoung, who was a convicted felon, received $2,500 after the preliminary hearing and another $7,500 after the trial from the Southland Corporation, which owned the 7-Eleven where Arias worked. In addition, the district attorney reduced felony drug charges pending against DeYoung to a misdemeanor at the time of the preliminary hearing. England, who was arrested for Arias's murder with defendant, pleaded guilty to being an accessory and was granted probation.

Finally, the defense offered expert testimony to show that the Hemastix test, in the absence of other evidence that a stain contains blood, is of no scientific value.

### Prior Convictions

On December 5, 1969, defendant attempted to shoot and rob Robert Palla, the clerk at Cooley's Liquor Store in Riverside, which is only a block and a half away from the 7-Eleven where defendant murdered Arias. Defendant and another man walked into the store a little before 1:00 a.m. Defendant said, "This is it, Bob," and pointed the rifle at Palla's midsection. Palla heard a "click," but the gun did not discharge. Palla backed away, asked defendant not to shoot, and retrieved a revolver from his coat pocket. Defendant and the other man fled. Defendant pleaded guilty to the attempted murder of Palla while armed with a .22-caliber rifle and pleaded no contest to an attempted purse-snatching that occurred on November 30, 1969.

On March 2, 1977, just over two months after being released from prison, defendant robbed Donald Auger, a pawnshop clerk. Defendant entered Bernie's Pawnshop in Riverside with his right hand in his coat pocket to simulate a gun. He locked the front door and ordered Auger to unlock the gun counter. Defendant grabbed a couple of guns and put them in his pocket. After handcuffing Auger, he took more handguns and some shells, but was unsuccessful in trying to load a weapon. Auger offered to help if defendant would remove the handcuffs. When defendant removed them, Auger pushed him away. Defendant struck Auger's face and head with the gun and left. Defendant was convicted of robbery and of being a felon in possession of a firearm.

### Prison Behavior

Defendant had spent most of his adult life in prison. The prosecution and defense offered extensive evidence on his behavior in prison and the possible reasons for his misbehavior.

Defendant repeatedly attacked prison guards. On January 24, 1975, defendant lunged at a correctional officer with a six-inch shank and stabbed him in the neck, back, and upper forearm. Defendant then used the weapon to stab a different officer who was trying to restrain him. That officer suffered four puncture wounds in his back. Defendant admitted wanting "just to strike out at any correctional officer" because he believed an inmate had been given a knife to attack him.

On April 25, 1975, when defendant had to be forcibly returned to his cell from the yard, he spun around and struck the accompanying officers with a sock filled with dominos. Then, while being escorted back to his cell in handcuffs, defendant lifted up his hands and hit an officer in the mouth. Three months later, defendant kicked a correctional officer in the back, provoking a fight between officers and inmates. After defendant was restrained, he kicked a different officer in the chest.

On numerous occasions in December 1973, defendant threw various substances—water, urine, tooth powder, and a mixture of scouring powder and chlorine bleach—at correctional officers as they walked past his cell. Defendant claimed this was a protest against the prison's failure to distribute various supplies. He then resisted being moved to a "quiet cell" until tear gas was fired into his cell.

The prosecution also offered evidence that defendant frequently engaged in violent confrontations with other inmates. On April 24, 1973, defendant and another inmate wielded shanks against two other inmates who had baseball bats on the prison baseball diamond at San Quentin Prison. On May 16, 1974, defendant, armed with a prison-made weapon, paired off for a fight with another inmate. When a correctional officer yelled to defendant to drop his weapon, defendant instead threw it over the fence and continued the fight. On January 28, 1975, defendant swung his waist chain in a circular motion at two other inmates in the cell and hit them. Although defendant claimed *he* was the one who was attacked, only the other inmates suffered injuries.

Finally, the prosecution offered evidence that knives and shanks were often found in defendant's cell. Correctional officers discovered weapons rolled up in a pair of his blue jeans or hidden in the toilet or other part of his cell. Defendant variously claimed ignorance of the weapons or said they belonged to another inmate or were only for self-defense.

Defendant offered evidence that violent encounters among prisoners and between prisoners and correctional officers were common in the mid-1970's,

especially at San Quentin. John Irwin, a convicted felon and sociology professor at San Francisco State University, testified that many prisoners prepared for violence by obtaining weapons and delivering preemptive "counter violence" against the slightest threat. Although some prisoners chose to join a prison gang under these conditions, defendant did not.

Defendant also offered testimony that the difference between his first stint at San Quentin in the 1970's and his incarceration on death row in the 1980's was "[l]ike night and day." Two former death row employees testified that defendant had been trouble free while they were there. Shortly thereafter, however, on September 12, 1986, defendant got into a struggle with deputies who were transporting inmates from the Riverside County jail to court. He swung at and tried to hit a deputy and refused to be handcuffed. When defendant was eventually subdued by a carotid restraint and handcuffed, he made a threat against one of the officers. Defendant claimed he had done nothing to provoke the officers' use of force.

*Other Mitigating Evidence*

Defendant presented extensive evidence about his family background and childhood. He was the third oldest of seven children. His parents drank excessively, fought, and had financial problems. Three of his siblings are alcoholics. The oldest child, Jerry, molested defendant when he was eight years old.

One younger brother, Brandon Burgener, testified that their home environment had been "very good" and that defendant was the only one who ever had any difficulty. Defendant's younger sister (and closest sibling), Gayla Hundley, testified that their parents used to fight—but deemed it nothing out of the ordinary—and said that the household was only "sometimes" happy. Defendant's sister Julie Steffani described the family environment as "pretty happy" but believed the children were physically abused. Defendant's older sister, Becky Jurs, testified that their parents had been much more punitive to the older children, including defendant. Defendant routinely received the blame when things went wrong and was often physically beaten and whipped. A change occurred around 1976, when their parents stopped drinking and started going to church. Prior to that, their mother sometimes invited guests to the home, got them drunk, beat them up, and robbed them of their jewelry.

When defendant was 10 years old, he was placed at the Eldora Home for Boys to receive extensive psychiatric care and was sedated with thorazine for nine months, even though it was not accepted practice to administer

thorazine in these doses to a child. He was expelled from school at 11 or 12, and subsequently was in and out of reform school.

Defendant spent most of his adult life in prison. His first felony conviction was at age 19, and he served part of that sentence at San Quentin. He committed the pawnshop robbery about two months after his release and was again sentenced to prison. Less than three months after being released from that prison commitment, he robbed and murdered William Arias.

Defendant claimed he went to the pawnshop in 1977 to get a weapon to defend himself. He was a witness to a murder at San Quentin and knew the Nuestra Familia prison gang had taken out a contract on his life. Then, one month after his release from prison, someone had fired a shot at him while he was driving alone. The bullet passed through the window and hit the passenger seat.

Defendant became interested in religion shortly before the Arias robbery murder. He read the Bible every morning, attended a Pentecostal church regularly, and encouraged England to attend with him to overcome her heroin addiction. The death row prison chaplain testified that defendant was the most faithful attendee at weekly services, was a leader in the group, and completed Bible courses in 1987 and 1988. He believed defendant had made a genuine change in his life.

Defendant's mother, Dorothy Burgener, did not think of defendant as a violent person. Defendant testified that although he used to be a violent person, he no longer was. However, defendant admitted he could spend a lot of time planning how to kill people—even taking an anatomy course in 1973 to learn the vital spots in a person's body—and felt others would kill him if they got the chance. Defendant's parole officer testified that defendant had been making a sincere effort to rehabilitate himself prior to his most recent arrest.

*Psychiatric Testimony*

Psychiatrist Lorna Forbes opined that defendant "came from what we call a classical type of family associated with child abuse." Mental health records revealed that, as early as kindergarten, defendant would aggressively "way-lay" children on the way to school; he set fires in the wastebasket; he stole milk money from the school; he was difficult to control; and he ran away at least twice. Defendant suffered from attention deficit disorder and was referred to a mental health center when he was seven years old.

Dr. Forbes diagnosed defendant as suffering from an adjustment disorder with a depressed mood and antisocial personality disorder, characterized as

"extreme" because of very severe abuse he suffered as a child and his multiple incarcerations. In her view, defendant repeatedly failed to receive appropriate treatment: he was not placed in a specialized foster home when he was a child, he did not receive psychotherapy and psychiatric hospitalization when he was sentenced to prison in 1969, and he did not receive psychotherapy when he was released from prison in 1976. However, Dr. Forbes did not know whether any effort had been made to get defendant treatment or whether defendant would have participated in treatment had it been available.

As a result of his experiences, defendant developed a paranoid view of the world and, when he was released from prison, became obsessed with protecting himself. Dr. Forbes believed that defendant was not an aggressive criminal but merely responded to perceived threats as would any other paranoid person. She did not believe he ever premeditated a murder.

Defendant expressed to her considerable remorse over the crimes he had committed, although he felt he was "set up" on the current offenses. Dr. Forbes believed defendant had been punished excessively for his behavior over his lifetime.

DISCUSSION

A. *Jury Selection Issues*

1. *Motion to quash jury venire based on underrepresentation of young and low-income adults*

██ On May 10, 1988, as voir dire was almost complete, defendant moved to quash the jury venire on the grounds it violated his state and federal right to a jury composed of a fair cross-section of the community. Attached to the motion was the declaration of Dr. Edgar W. Butler, who stated that he had historically found significant underrepresentation of Hispanics as well as young and low-income adults in jury venires in the Riverside, Palm Springs, and Indio districts. At the evidentiary hearing, Dr. Butler observed that recent changes in jury procedures by Riverside County had eliminated the underrepresentation of Hispanics but had not significantly ameliorated the underrepresentation of young or low-income adults. The trial court found no systematic exclusion of any cognizable group and denied the motion.

██ "Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S.

Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358-367 [58 L.Ed.2d 579, 583-588, 99 S.Ct. 664]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983].) 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at pp. 586-587]; *People* v. *Howard, supra,* 1 Cal.4th at p. 1159.) . . . If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].)" (*People v. Horton* (1995) 11 Cal.4th 1068, 1087-1088 [47 Cal.Rptr.2d 516, 906 P.2d 478].)

We have already held that persons of low income do not constitute a cognizable class under the first prong of the *Duren* test. (*People v. Carpenter* (1997) 15 Cal.4th 312, 352 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*).) Also, while we have reserved the question whether the young qualify as a distinctive group, the Court of Appeal has rejected the claim "a number of times." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1061 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293].)

The parties dispute whether *Duren*'s second prong has been met. Defendant's expert, Dr. Butler, testified that, for young adults aged 18 to 24, the comparative disparity between the census figures and the time-qualified jurors for March to April 1988 was 65 percent; the People, however, point out that the absolute disparity between the two was only 10.7 percent. The significance of these disparities is further clouded by defendant's concession that the 18-to-24 age grouping is "unworkable" and should be replaced by the 18-to-30 age grouping. The disparity percentages for low-income adults are equally murky, since defendant seems to rely on income categories that differ from those used by his expert below. The income-based disparities, however, appear to be somewhat less than those for young adults.

Whether these numbers are sufficient to satisfy the second prong is also uncertain, inasmuch as the United States Supreme Court has not yet spoken

definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity. (*People v. Anderson* (2001) 25 Cal.4th 543, 567 [106 Cal.Rptr.2d 575, 22 P.3d 347] (*Anderson*).) Fortunately, we need not resolve the issue here because, as the trial court ruled, defendant failed to establish a prima facie case under *Duren*'s third prong by showing the disparity was caused by the *systematic* exclusion of young or low-income adults from Riverside County juries.

■ A defendant does not discharge the burden of demonstrating that the underrepresentation was due to systematic exclusion merely by offering statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process. (*People v. Horton, supra*, 11 Cal.4th at p. 1088.) ■ Riverside County relies on voter registration lists and Department of Motor Vehicle (DMV) records of registered drivers and holders of identification cards, which are merged into a master list. ■ We have held that such a list " ' "shall be considered inclusive of a representative cross-section of the population" ' " where it is properly nonduplicative." (*People v. Ochoa* (2001) 26 Cal.4th 398, 427 [110 Cal.Rptr.2d 324, 28 P.3d 78].) ■ The record reveals that Riverside County has undertaken reasonable efforts to eliminate duplicate entries and, as the trial court found, there was no evidence how (if at all) the remaining duplicates would have affected the composition of the jury draw.

The record also shows the jury commissioner's guidelines for excusing prospective jurors from service were neutral as to age and, except as to economic hardship, were also neutral as to income. The existence of hardship excuses, however, did not deprive defendant of his right to a fair cross-section of the community. Neither the state nor federal Constitutions oblige local government to increase jury fees or otherwise ameliorate the economic hardship caused by jury duty. (E.g., *People v. Nicolaus* (1991) 54 Cal.3d 551, 571 [286 Cal.Rptr. 628, 817 P.2d 893]; *People v. Harris* (1989) 47 Cal.3d 1047, 1077-1078 [255 Cal.Rptr. 352, 767 P.2d 619]; see also *State v. Roberts* (Mo. 1997) 948 S.W.2d 577, 603 [no duty to provide child care].)

Defendant then complains that the county failed "to obtain other lists which might include more of the poor or more young adults in the jury pool" and that the county failed "to target either of those specific groups in an attempt to summon more of them and to require greater numbers to appear." As we recently explained, "[t]his claim fails because the United States Constitution 'forbids the *exclusion* of members of a cognizable class of jurors, but it does not require that venires created by a neutral selection procedure be supplemented to achieve the goal of selection from a representative cross-section of the population.' " (*People v. Ochoa, supra*, 26 Cal.4th

at p. 427.) So long as the state uses criteria that are neutral with respect to the underrepresented group, the state's failure to adopt other measures to increase the group's representation cannot satisfy *Duren*'s third prong. (*Id.* at pp. 427-428.)

Where, as here, a county's jury selection criteria are neutral with respect to the distinctive group, the defendant must identify some aspect of the manner in which those criteria are applied that is not only the probable cause of the disparity but also constitutionally impermissible. (*Anderson, supra,* 25 Cal.4th at pp. 566-567.) Dr. Butler confessed that any conclusions based on the effects of duplicate entries would be "speculation" and that he "really" did not know whether the master list was the source of any disparities by age or income. Despite this uncertainty, he nonetheless concluded the disparities were "systematic" because "there's probably one chance in 10,000 that that would have happened by chance" and the disparities were "continually occurring." Speculation as to the source of the disparity is insufficient to show systematic exclusion (*id.* at p. 568), as is evidence the disparity is unlikely to be a product of chance (*People v. Breaux* (1991) 1 Cal.4th 281, 298 [3 Cal.Rptr.2d 81, 821 P.2d 585]) or has endured for some time (*People v. Sanders, supra,* 51 Cal.3d at p. 492). Accordingly, the trial court did not err in finding defendant had failed to make out a prima facie case.

### 2. *Motion to quash jury venire based on underrepresentation of African-Americans*

■ During the evidentiary hearing on defendant's claimed underrepresentation of young and low-income adults, the parties discovered a possible claim relating to the underrepresentation of African-Americans. Deborah Pass, the master calendar and jury services manager for the Riverside County Superior Court, testified that her office occasionally received requests from some courtrooms to send up Hispanic or African-American prospective jurors who were present in the jury room to supplement nondiverse panels assigned to those courtrooms. Pass's office had been asked to do so four times that year: January 20, March 10, March 14, and April 26. The March 14 request, which involved African-Americans, could have affected the composition of the venire available for the defendant's jury selection on one day—March 22—to the extent the court that day drew from the jurors who had been called for service the week of March 14 rather than from the pool of more than 600 jurors who had been summoned specifically for defendant's trial. The record did not reveal the number of African-American jurors called up to another courtroom on March 14 or whether they had been empaneled on a jury there, released from jury service, or were available in the jury assembly room on March 22. The record also did not

reveal whether the court in defendant's case drew from the group of veteran jurors on March 22 and, if so, how many.

After Pass's testimony, the district attorney asked the court to quash the jury venire and restart jury selection—not because of the reasons identified in defendant's *Duren* motion, but because of Pass's testimony concerning the possible March 14 reassignment of prospective African-American jurors. Defendant joined in the request. The court denied the motion, finding insufficient evidence of a statistically significant disparity under *Duren*'s second prong. A couple of weeks later, in an untimely challenge to the jury composition after the jury had been sworn, defendant reiterated his objection to the practice of supplementing assigned jury panels with additional minority prospective jurors. The district attorney joined in the motion. The court again denied it, noting "the possible effect, which was, as far as I am concerned, insignificant with regard to somebody asking for a certain minority group."

As we have stated, a prima facie violation of the fair cross-section requirement requires proof (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. (*Anderson, supra,* 25 Cal.4th at p. 566.) No party disputes that African-Americans are a distinctive group in the community; *Duren*'s first prong is therefore satisfied.

The second prong "requires a constitutionally significant difference between the number of members of the cognizable group appearing for jury duty and the number in the relevant community." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1155 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Defendant cannot make such a showing. Census figures set the African-American population of Riverside County at 4.5 percent. According to Dr. Butler, African-Americans constituted 3.3 percent of defendant's venire at the outset and 3.5 percent after time-qualification. Defendant urges us to employ the "comparative disparity" test, which computes to a 27 percent disparity prior to time-qualification and a 22 percent after time-qualification. The People, on the other hand, ask that we adopt the "absolute disparity" test, which results in a disparity of 1.2 percent prior to time-qualification and a disparity of only 1 percent after time-qualification.

As we explained above, the United States Supreme Court has not yet spoken definitively on either the means by which disparity may be measured

or the constitutional limit of permissible disparity. (*Anderson, supra,* 25 Cal.4th at p. 567.) This court has observed that the United States Supreme Court itself used an absolute disparity statistical analysis in *Duren*—as have many federal courts—and that the comparative disparity test has been criticized as distorting the underrepresentation when, as here, the group allegedly excluded is very small. (*People v. Bell* (1989) 49 Cal.3d 502, 527, fn. 14 [262 Cal.Rptr. 1, 778 P.2d 129]; see also *U.S. v. Royal* (1st Cir. 1999) 174 F.3d 1, 8-9, citing cases; *Thomas v. Borg* (9th Cir. 1998) 159 F.3d 1147, 1150 ["the comparative disparity test is strongly disfavored in the Ninth Circuit on the ground that it exaggerates the effect of any deviation"].) But we have also repeatedly declined to adopt any one statistical methodology to the exclusion of others. (*People v. Ramos, supra,* 15 Cal.4th at p. 1155.) Because substantial evidence supports the trial court's finding of no significant disparity under either test, we need not decide the issue.

Dr. Butler's testimony established a range of absolute disparity between 1 and 1.2 percent and of comparative disparity of between 22 and 27 percent. These percentages are well within the tolerance accepted by this court (*People v. Ramos, supra,* 15 Cal.4th at p. 1156 [absolute disparity between 2.7 and 4.3 percent; comparative disparity between 23.5 and 37.4 percent]) and by the lower federal courts. (E.g., *U.S. v. Weaver* (3d Cir. 2001) 267 F.3d 231, 243 [absolute disparity of 1.23 and 0.71 percent; comparative disparity of 40.01 and 72.98 percent]; *U.S. v. Chanthadara* (10th Cir. 2000) 230 F.3d 1237, 1256-1257 [absolute disparity of 3.23 and 1.6 percent; comparative disparity of 40.89 and 58.39 percent]; *U.S. v. Royal, supra,* 174 F.3d at pp. 10-11 & fn. 10 [absolute disparity of 2.97 percent and comparative disparity of 60.9 percent]; *Thomas v. Borg, supra,* 159 F.3d at p. 1151 [absolute disparity of 5 percent]; cf. *Taylor v. Louisiana* (1975) 419 U.S. 522, 525 [95 S.Ct. 692, 695, 42 L.Ed.2d 690] ["only a very few women, grossly disproportionate to the number of eligible women in the community, are called for jury service"].) These figures are also well below the 10 percent absolute disparity found inadequate to establish a constitutional violation in *Swain v. Alabama* (1965) 380 U.S. 202, 208-209 [85 S.Ct. 824, 829-830, 13 L.Ed.2d 759], overruled on other grounds in *Batson v. Kentucky* (1986) 476 U.S. 79, 100, footnote 25 [106 S.Ct. 1712, 1725, 90 L.Ed.2d 69].

■■ ■■ Because we have rejected the claim under *Duren*'s second prong, we need not reach the issue of systematic exclusion under *Duren*'s third prong. (*U.S. v. Royal, supra,* 174 F.3d at p. 11.)[3] ■ However, we cannot end our discussion without expressing grave doubt as to the propriety

---

[3]Defendant also appears to claim the court's practice of supplementing jury panels violated his right to equal protection. Because he failed to object on this basis below, the claim is

of the apparent (albeit infrequent) practice of the Riverside County Superior Court in making race-conscious assignments to bolster minority representation in various courtrooms. Although ostensibly undertaken for the benign purpose of increasing minority representation on a particular jury and thus forestalling possible *Duren* or equal protection challenges, it is nonetheless true, as Ms. Pass observed, that a request by one courtroom for minority jurors may have the effect of reducing the number of that group available to be assigned to *other* courtrooms on a random basis. In this case, of course, any disparity was not constitutionally significant. Yet, race-conscious assignment, no matter how infrequent, is not consistent with the spirit of the Sixth Amendment guarantee of a jury drawn from a fair cross-section of the community or with our own Constitution. (See, e.g., Cal. Const., art. I, § 31.) As the district attorney predicted, we cannot condone such a practice. Accordingly, we·find it prudent, as an exercise of our supervisory power over California criminal procedure, to prohibit our state courts in the future from making race-conscious assignments from the jury assembly room to a courtroom. Because we find no constitutional error here, however, defendant's claim must be denied.

### 3. *The screening process for hardship excusals*

Before the first group of jurors was called, the court announced its intention "to run through the jurors and find those [who] indicate they can serve without a hardship and [who] do not know anything about the case that would interfere with their exercise of a fair and impartial judgment" before having them complete the questionnaires. No objection was made to this procedure.

When the first group was sworn, the court informed them the case was a retrial involving the "possible imposition of the death penalty" and was estimated to last "probably, approximately six months." In panels of 12, the court inquired whether the time involved would create a hardship and, if the juror said it would, did not inquire further. After several panels had been completed, defense counsel stated he was "beginning to have some reservations about the procedure" in that by failing to inquire further as to their

waived. (*People v. Danielson* (1992) 3 Cal.4th 691, 703-704 [13 Cal.Rptr.2d 1, 838 P.2d 729].) We note as well that even if he had preserved the claim, defendant could not prevail on it. A defendant asserting a denial of equal protection "must show that the procedure employed resulted in substantial underrepresentation of *his* race or of the identifiable group *to which he belongs.*" (*Castaneda v. Partida* (1977) 430 U.S. 482, 494 [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498], italics added; *U.S. v. Esquivel* (9th Cir. 1996) 88 F.3d 722, 725.) Defendant is White. We are not presented with, and therefore do not decide, whether defendant would have third party standing to assert the equal protection rights of the African-American jurors in this circumstance. (See *Campbell v. Louisiana* (1998) 523 U.S. 392, 397-398 [118 S.Ct. 1419, 1422-1423, 140 L.Ed.2d 551, 172 A.L.R. Fed. 597].)

reasons for hardship, the court may have inadvertently excused some good defense jurors. The court responded that nobody who claimed a hardship would be a good juror and that this procedure enabled the court to find the people who could give the necessary time.

Defense counsel subsequently filed a "First Motion for New Trial," in which he complained the court had failed to provide the prospective jurors with any guidelines to assist them in their determination that the length of the trial would cause them hardship sufficient to justify excusal. The court denied the motion, stating its belief "that we need to have jurors who can say that they can serve without suffering a hardship." Following the conclusion of this screening process, counsel filed a "Third Motion for Mistrial," which was based on the same grounds and added, as exhibits, copies of the excusal policies adopted by the Riverside County Jury Commissioner. The motion was again denied.

■ Defendant now renews his challenge to the summary procedure by which the trial court screened prospective jurors for hardship. He asserts that some of the jurors might not have suffered from a hardship sufficient to warrant their excusal and that their removal from the jury pool tended to produce a pro-death venire. We have repeatedly rejected any claim that a trial court's policy of freely excusing prospective jurors for financial hardship deprives a defendant of his right to a fair and impartial jury. (*People v. Medina* (1995) 11 Cal.4th 694, 747 [47 Cal.Rptr.2d 165, 906 P.2d 2](*Medina*); *People v. Howard, supra,* 1 Cal.4th at p. 1160 ["defendant cannot demonstrate systematic exclusion based upon the even-handed application of a neutral criterion, such as hardship"].) Although the court's procedure may not constitute the best practice (*People v. Thompson* (1990) 50 Cal.3d 134, 158 [266 Cal.Rptr. 309, 785 P.2d 857]), it did substantially expedite the selection process by " 'culling out' prospective jurors who probably would have been unable to serve as jurors in any event." (*People v. Ervin* (2000) 22 Cal.4th 48, 73 [91 Cal.Rptr.2d 623, 990 P.2d 506] (*Ervin*).) And here, as in *Ervin,* "once the preliminary screening process had concluded, the court and counsel then conducted the usual voir dire examination of the remaining prospective jurors in selecting the actual jurors who would serve on defendant's jury." (*Ibid.*)

Defendant also asserts the trial court exaggerated the length of the trial, pointing out that the actual trial, from swearing the jury to verdict, took less than three and one-half months. We cannot fault the trial court's six-month estimate—especially when defense counsel conceded it was "entirely possible" the case could last six months and failed to object when the court stated that "[c]ounsel have indicated to me previously they would like to have up to a possible six months."

Defendant claims next that the court's description of the case could have led prospective jurors to confuse a reluctance to impose the death penalty with a "hardship," leading to their summary removal. Although the prosecution raised this concern, defense counsel never adopted it and thus waived the claim on appeal. (*People v. Visciotti* (1992) 2 Cal.4th 1, 37-38 [5 Cal.Rptr.2d 495, 825 P.2d 388].)[4] We also reject the claim on its merits. The trial court's hardship inquiry was explicitly limited to the estimate the trial would take six months. Defendant has not identified any basis in the record for confusion.

Finally, defendant failed to join in the People's objection to the court's policy of requiring counsel to stipulate to the excusal for hardship of additional jurors during individual voir dire and thus has waived the claim. In his objection, the district attorney complained the court had informed a juror that the People "would not stipulate to his being excused" and "expressed in front of the jury panel that it was displeased." Since counsel's failure to object plainly was tactical, defendant was not deprived of his right to the effective assistance of counsel. (*Ervin, supra*, 22 Cal.4th at p. 78.)

### 4. *The peremptory excusal of Prospective Juror Kenneth F.*

■ Defendant contends next that he was denied his right under the state and federal Constitutions because the prosecutor exercised his first peremptory challenge to excuse Kenneth F., the only African-American member of the panel.

■ The use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution (*People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]) as well as the equal protection clause of the Fourteenth Amendment to the United States Constitution. (*Batson v. Kentucky, supra*, 476 U.S. at p. 89 [106 S.Ct. at p. 1719].) The defendant need not be of the same race to object to a prosecutor's race-based exercise of peremptory challenges. (*Powers v. Ohio* (1991) 499 U.S. 400, 415-416 [111 S.Ct. 1364, 1373-1374, 113 L.Ed.2d 411].)

"A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors

---

[4]A close reading of the record reveals that defense counsel *did* ultimately adopt this concern *after* the jury had been sworn, which was too late to preserve the claim for appeal. (Pen. Code, former § 1060, enacted 1872, repealed Stats. 1988, ch. 1245, § 21, p. 4155; see now Code Civ. Proc., § 225, subd. (a)(1).)

has been excluded on the basis of group or racial identity. The high court has explained that the defendant is required to 'raise an inference' that the exclusion was based on group or race bias. [Citation.] Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).)

In this case, defendant objected when the prosecutor excused Prospective Juror Kenneth F., asserting the juror was excused because of his race. The court offered to hear "any response" from the People. The district attorney responded that Kenneth F. had been the most talkative of the prospective jurors, which raised a concern whether he was indecisive, and that he had admitted difficulty in imposing the death penalty on anyone who continued to deny his guilt, which defendant intended to do in this case. Defendant objected that the prosecutor did not ask non-African-American jurors the same question regarding their reluctance to impose the death penalty on a defendant who continued to deny his guilt. In response, the prosecutor explained that he posed this question to Kenneth F. because of the juror's response on the written questionnaire that he would have particular difficulty in voting for the death penalty under those circumstances. The court accepted the prosecutor's stated reasons and agreed the juror had appeared somewhat reluctant to impose the death penalty in those circumstances.

We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " (*Ervin, supra,* 22 Cal.4th at p. 74.) We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1284-1285 [91 Cal.Rptr.2d 211, 989 P.2d 645].) So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. (*Ervin, supra,* 22 Cal.4th at p. 75.)

Assuming the trial court found that defendant had established a prima facie case here (*People v. Hayes, supra,* 21 Cal.4th at p. 1284), we find substantial evidence to support the trial court's denial of the *Batson/Wheeler* claim. A prosecutor legitimately may exercise a peremptory challenge against a juror who is skeptical about imposing the death penalty. (*People v. Catlin* (2001) 26 Cal.4th 81, 118 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Kenneth F. admitted it would be "hard" for him to impose the death penalty

on a defendant who continued to maintain his innocence, even when the jury had found (and all the evidence indicated) he had committed the crime—which was precisely the situation here.

Defendant maintains the justification was nonetheless pretextual in that the prosecutor allegedly failed to ask the same question of non-African-American jurors. But, after the trial court considered this and other arguments from both defendant and the prosecutor, it accepted the prosecutor's nondiscriminatory justifications. The record reflects the trial court made a sincere and reasoned effort to evaluate the prosecutor's justifications for excusing Kenneth F.; therefore, its conclusions are entitled to deference on appeal. (*Ervin, supra,* 22 Cal.4th at p. 75.)

### 5. *Limitations on voir dire*

 Defendant contends the trial court erred under the state and federal Constitutions by restricting his ability to question jurors during the death-qualification voir dire. He argues that where, as here, his conviction has been affirmed on appeal and the retrial concerns only the penalty, he should have been permitted to pose specific questions concerning the facts of his conviction. We review limitations on voir dire, including death-qualification voir dire, for abuse of discretion. (*Jenkins, supra,* 22 Cal.4th at p. 990.)

 Our review of the voir dire reveals that defense counsel had ample opportunity to ascertain the views of prospective jurors on robbery murder in general and in the circumstances of this case. Although the trial court sustained the People's objections when defense counsel asked prospective jurors whether they would impose the death penalty after considering a rather detailed account of some of the facts of this case, and whether a prospective juror could continue to be impartial after hearing a list of defendant's prior crimes, these questions invited jurors to prejudge the case. " 'There was no error in ruling that questions related to the jurors' attitudes toward evidence that was to be introduced in this trial could not be asked during the sequestered [death-qualification] voir dire.' " (*Jenkins, supra,* 22 Cal.4th at p. 991.) Defendant had no right to ask specific questions that invited prospective jurors to prejudge the penalty issue based on a summary of the aggravating or mitigating evidence (*People v. Cash* (2002) 28 Cal.4th 703, 721-722 [122 Cal.Rptr.2d 545, 50 P.3d 332]), to educate the jury as to the facts of the case (*People v. Sanders* (1995) 11 Cal.4th 475, 538-539 [46 Cal.Rptr.2d 751, 905 P.2d 420]), or to instruct the jury in matters of law (*People v. Ashmus* (1991) 54 Cal.3d 932, 959 [2 Cal.Rptr.2d 112, 820 P.2d 214]).

Defendant also points out that the trial court sustained objections when defense counsel inquired whether a prospective juror would impose the death penalty for every premeditated murder, regardless of the surrounding circumstances, and whether a prospective juror could be swayed against imposing the death penalty by evidence the defendant had a difficult childhood. We need not consider whether these rulings were error since, in both cases, counsel was eventually able to pose the substance of the questions to these jurors. The first juror was later asked whether he would "automatically choose the death penalty" after learning that defendant "has already been convicted of deliberate premeditated murder." The second juror was asked whether he could take "into account" and "consider" evidence that defendant had "a difficult childhood."

In any event, none of the prospective jurors identified by defendant actually sat on the jury, the defense had a number of peremptory challenges remaining when it accepted the jury, and it did not express dissatisfaction with the jury as sworn on this ground. We therefore find that any possible error could not have been prejudicial. (*Carpenter, supra,* 15 Cal.4th at p. 354.)

### 6. *Denial of pretrial statement concerning reason for retrial*

Prior to jury selection, defendant submitted a preliminary statement to be read to the venire. The proposed statement would have informed the jury that defendant had been sentenced to death following a trial in which he "declined to participate" and "insisted that his counsel present no mitigating evidence, though such evidence was available. . . . For that reason, and because under the circumstances the jury may have been misled as to the nature of its sentencing task, the Supreme Court of California reversed the penalty judgment, and remanded the case to this court for a retrial of the penalty phase." The defense acknowledged that it could have sought instead to exclude any reference to the prior verdict but had chosen not to do so. The trial court sustained the People's objection to the proffered statement.

Defendant now contends the trial court's failure to inform potential jurors of the circumstances that led this court to reverse the verdict of death at the first penalty trial violated his Sixth and Fourteenth Amendment rights to an impartial jury. However, he failed below to make any argument whatsoever on federal constitutional grounds and cannot do so for the first time on appeal. (*People v. Davis* (1995) 10 Cal.4th 463, 501-502, fn. 1 [41 Cal.Rptr.2d 826, 896 P.2d 119].) We also reject his claim on the merits.

The jury sat as the trier of fact in this case. Previous legal rulings—and the reasons for them—are not proper matters for the jury to consider in

performing its duties. At a new trial following reversal, "[n]o advantage is to be taken of the former verdict on the one side, or the rule of the court, for awarding such second trial on the other." (3 Blackstone, Commentaries 391; accord, *People v. Edwards* (1991) 54 Cal.3d 787, 845 [1 Cal.Rptr.2d 696, 819 P.2d 436] [we "have never suggested that the trial court is required to inform the jury of the history of the prior proceedings"].)

Defendant worries the jury might have speculated that the prior verdict was reversed on a technicality and therefore "have felt this pressure to conform their verdict to that of the first jury." But the proper solution to this problem would have been to move to exclude any reference to the prior verdict. Counsel consciously chose not to do so, apparently for tactical reasons. (*People v. Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107]; see *Hopt v. Utah* (1887) 120 U.S. 430, 442 [7 S.Ct. 614, 620, 30 L.Ed. 708].) In any event, no constitutional error occurred. (Cf. *Britz v. Thieret* (7th Cir. 1991) 940 F.2d 226, 231-232.)

### 7. *Cumulative Error*

Defendant argues that, considered cumulatively, the errors in jury selection violated his right to a fair trial. Because we have found no errors, his claim of cumulative error fails. (*People v. Seaton* (2001) 26 Cal.4th 598, 639 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

### B. *Evidentiary Rulings*

### 1. *Evidence of criminal activity in prison*

Defendant raises a number of challenges based on the state and federal Constitutions to the admissibility of the evidence of his criminal behavior in prison. He waived the majority of these challenges by failing to object on those grounds below.[5] (*People v. Davis, supra,* 10 Cal.4th at pp. 532-533 & fn. 29.) We also reject them on the merits.

Defendant first raises a cluster of statutory and constitutional questions relating to the fairness of permitting the prosecution to introduce prison incidents that were nearly 15 years old at the time of trial. But " 'neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of

---

[5]Defendant *did* preserve an objection to the admissibility of criminal activity that had never been adjudicated. We have repeatedly rejected this claim, and do so again here. (E.g., *Carpenter, supra,* 15 Cal.4th at p. 401; *People v. Cain* (1995) 10 Cal.4th 1, 69-70 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

section 190.3, factor (b).' " (*People v. Hart* (1999) 20 Cal.4th 546, 642 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Indeed, "a prosecutor may offer evidence in aggravation of criminal violence that has occurred at any time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1158 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*).) The passage of time affects merely its weight, not its admissibility. (*People v. Anderson, supra,* 52 Cal.3d at p. 476.) In this case, the earlier conduct was highly relevant to show that defendant's violent attack on sheriff's deputies in September 1986 was not an isolated incident. (*People v. Frank* (1990) 51 Cal.3d 718, 729 [274 Cal.Rptr. 372, 798 P.2d 1215].) Moreover, a penalty trial is not the equivalent of a criminal prosecution for purposes of due process and speedy trial analysis, since "the 'penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 822-823 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

We likewise reject defendant's contention that the prison incidents denied him his constitutional right to counsel. (*Rodrigues, supra,* 8 Cal.4th at p. 1158.) Defense counsel conceded below that he had received adequate notice of and discovery for each of these incidents. The defense was also permitted to, and did, cross-examine witnesses and offer contrary evidence.

Defendant also complains that the incidents in which he threw water, urine, scouring powder, bleach, and other substances at correctional officers were not admissible under section 190.3, factor (b), which encompasses only criminal activity involving the use or attempted use of force or violence or the express or implied threat to use force or violence. But each of those challenged incidents constitutes a battery (*Inter-Insurance Exchange v. Lopez* (1965) 238 Cal.App.2d 441, 444-445 [47 Cal.Rptr. 834]; see also § 244), which is defined by statute as the "willful and unlawful use of force or violence upon the person of another." (§§ 242, 4501.5.) The admissibility of these incidents is not defeated by defense evidence that the incidents occurred during periods of prison unrest and that other inmates engaged in similar behavior during the period. Such evidence merely goes to the weight of the prior conduct. Inasmuch as the defense was permitted to present this assertedly ameliorative evidence to the jury, no error occurred.

### 2. *Threats made by defendant against Nola England*

The defense of lingering doubt included efforts to impeach Nola England's detailed testimony at the 1988 penalty retrial with her inability to recall certain details during her testimony at the 1981 guilt phase trial. England explained that she had been afraid to tell the truth in 1981 because of threats made against her and her children, but had also been afraid to lie

because of the risk of perjury. She therefore decided to claim an inability to remember when asked a number of questions at the 1981 proceeding.

The defense elicited the existence of the threats on direct examination. On cross-examination, England identified defendant as the source of the threats and testified that the threats had been conveyed to her by LeRoy Yant, who had been in jail with defendant. Out of the presence of the jury, defense counsel questioned England about Yant and discovered he had been killed in a motorcycle accident eight months earlier. Defense counsel then moved to strike England's testimony about the threats as hearsay and "prejudicial." The trial court denied the motion, observing that the evidence was relevant to England's credibility. Before testimony resumed, the court instructed the jury that the evidence of threats communicated to England was not being offered for its truth but only "as communications that she heard and, as you may consider them in whatever way they may relate to credibility. Not for the truth of it."

On appeal, defendant renews his claims that the evidence was hearsay and unduly prejudicial and adds that its admission violated his federal rights to due process and confrontation. We note preliminarily that defendant waived his constitutional claims by failing to articulate them below. (*Rodrigues*, *supra*, 8 Cal.4th at p. 1116, fn. 20; *People v. Garceau* (1993) 6 Cal.4th 140, 173 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Those constitutional claims, which depend on a finding that the threat evidence was hearsay, are also meritless. This evidence was not offered for its truth.

Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. (*People v. Malone* (1988) 47 Cal.3d 1, 30 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218]; see generally Evid. Code, § 780.) An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. (*People v. Feagin* (1995) 34 Cal.App.4th 1427, 1433 [40 Cal.Rptr.2d 918]; see *People v. Avalos* (1984) 37 Cal.3d 216, 232 [207 Cal.Rptr. 549, 689 P.2d 121].) In this case, the threats explained why England's testimony in 1981 differed in certain respects from her current testimony.

Defendant complains that because Yant was dead, no evidence corroborated England's claim that defendant had threatened her. There is no requirement, however, that threats be corroborated before they may be admitted to reflect on the witness's credibility. Indeed, it is not necessary to show the witness's fear of retaliation is "directly linked" to the defendant for the

threat to be admissible. (*People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588 [28 Cal.Rptr.2d 897].) It is not necessarily the source of the threat—but its existence—that is relevant to the witness's credibility. In this case, evidence of the threats was relevant to explain why England testified as she did in 1981. (*Ibid.*) Inasmuch as the jury was promptly and correctly instructed as to the limited purpose of the evidence, we cannot say that the trial court abused its discretion under Evidence Code section 352 in allowing the testimony. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369 [37 Cal.Rptr.2d 596].)

We also find that any error in admitting the evidence was harmless, since the court ultimately instructed the jury to disregard the evidence of the threats. We presume the jury followed the court's admonition.

### 3. *Joseph DeYoung's polygraph examination*

Almost a month after defendant's arrest, Joseph DeYoung took a polygraph test administered by John Higbie, who was then a polygraph examiner for the Riverside County District Attorney's Office. DeYoung was asked whether he had shot Arias and whether he had participated in any way in the robbery and murder. Higbie concluded that DeYoung was truthful when he denied any participation in the crime. This evidence was never presented to the jury.

At the penalty retrial, defendant made a motion to admit the testimony of Marshall Gaines, a polygraph examiner, who would have testified that DeYoung's polygraph results should have been judged "inconclusive." This would supposedly have permitted defendant to argue that Higbie's erroneous interpretation had misled the prosecution in conducting its investigation. Defendant explicitly declined to offer the polygraph results on the question of DeYoung's credibility, and therefore took no position on the accuracy of the polygraph results and submitted no evidence to show that polygraphs were generally accepted in the scientific community. After hearing Gaines testify outside the presence of the jury, the court denied the motion.

On appeal, defendant has switched gears and now contends the inconclusive results *would* have impeached DeYoung's credibility. As defendant concedes, he did not rely on this theory below. The claim is therefore waived. (*People v. Morris* (1991) 53 Cal.3d 152, 193, fn. 6 [279 Cal.Rptr. 720, 807 P.2d 949].) And even if the claim had been preserved, we would reject it. (See Evid. Code, § 351.1.)

We would likewise reject defendant's claim that exclusion of the evidence violated due process, inasmuch as defendant never offered evidence the test

was reliable. Before a criminal defendant can establish a federal due process right to use the results of a polygraph examination, it is necessary (although perhaps not sufficient) to offer proof that the technique has become generally accepted in the scientific community. (*People v. Ayala* (2000) 23 Cal.4th 225, 264 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Price* (1991) 1 Cal.4th 324, 420 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see generally *United States v. Scheffer* (1998) 523 U.S. 303, 309 [118 S.Ct. 1261, 1265, 140 L.Ed.2d 413] ["there is simply no consensus that polygraph evidence is reliable"].) Here, defendant actively undermined the reliability of the polygraph examination, pointing out that the control questions were defective and that Higbie had failed to comply with accepted standards for performing examinations. Defendant therefore cannot rely on *Rupe v. Wood* (9th Cir. 1996) 93 F.3d 1434, which found error in the exclusion of polygraph results showing the state's chief witness had lied in denying involvement in the murder when the witness had "indisputably" played some role in the offenses (*id.* at p. 1441) and the defense *had* offered evidence of the test's reliability. (*Id.* at p. 1439; but cf. *Goins v. Angelone* (4th Cir. 2000) 226 F.3d 312, 326, fn. 7 [" '[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings' "]; accord, *United States v. Scheffer, supra,* 523 U.S. at p. 315 [118 S.Ct. at p. 1267] ["our precedents . . . do not support a right to introduce polygraph evidence, even in very narrow circumstances"].)

Defendant also claims, as he did below, that Gaines's testimony would have shown that DeYoung's polygraph examination was "incorrectly and incompetently interpreted" and "[i]t was because of this false conclusion that no investigation was performed concerning DeYoung's involvement in the 7-Eleven incident." Defendant has not explained, however, why evidence of DeYoung's polygraph examination was necessary to attack the police investigation. Indeed, he has not shown that the police ever learned of the polygraph examination, which took place about a month after defendant's arrest, or what the police would have done differently had they believed DeYoung's polygraph was inconclusive. Moreover, defendant has not identified any obstacle to his eliciting the extent to which the police did or did not investigate DeYoung's involvement in the crime. Because Gaines's opinion of Higbie's interpretation of DeYoung's polygraph was not relevant to any issue, the trial court did not abuse its discretion in excluding the evidence.[6]

---

[6]Although defendant waived any federal claim by failing to object on that basis below (*People v. Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330]), it is also plain that no federal error occurred. Defendant was not foreclosed from effectively challenging the police investigation (let alone the prosecution's case) or from presenting crucial

### 4. *Autopsy photographs*

▇▇▇ The pathologist referred to three photographs taken during the autopsy, People's exhibits Nos. 28, 30, and 31, as well as a photograph of an X-ray, People's exhibit No. 29, to illustrate his testimony concerning the manner in which Arias was shot and the nature of his gunshot wounds. Defense counsel, while conceding the photographs conveyed "important information" as to the nature of the injuries and the bullets' trajectories and were not cumulative, objected to exhibits Nos. 30 and 31 on the grounds that they depicted injuries Arias suffered during surgery and that Arias's body was unwashed. In his opinion, this rendered the photographs "somewhat prejudicial." The court overruled the objection and directed the prosecution to identify for the jury the "wounds or sewn-up wounds that were not related to the shooting itself." The prosecution complied with the court's request.

▇▇▇ We review the admission of the two photographs under the deferential abuse of discretion standard. (*People v. Farnam* (2002) 28 Cal.4th 107, 185 [121 Cal.Rptr.2d 106, 47 P.3d 988] (*Farnam*).) "[T]he prosecution has wider latitude at the penalty phase to introduce illustrative evidence of the capital crime, because such evidence comes too late to prejudice the determination of guilt, and the brutal circumstances are relevant to the penalty determination." (*Anderson, supra,* 25 Cal.4th at p. 593.) " 'Generally, photographs that show the manner in which a victim was wounded are relevant to the determination of malice, aggravation and penalty.' " (*Farnam, supra,* 28 Cal.4th at p. 185.) ▇▇▇ Here, the photographs aided the pathologist in explaining the circumstances of the murder under factor (a) of section 190.3 and illustrating which of the wounds by themselves would have been fatal. That defendant chose not to dispute the pathologist's findings did not render the photographs irrelevant. (*People v. Weaver* (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

We have reviewed the photographs and find that they were not impermissibly inflammatory. As defense counsel noted below, the prosecutor "has been careful to select two photographs out of many he could have chosen to illustrate the evidence." Neither photograph was unduly gruesome or likely to inflame the passions of the jury. The trial court acted within its discretion to admit them. (*Farnam, supra,* 28 Cal.4th at p. 186.)

We additionally reject defendant's claim that admission of the photographs violated his state and federal constitutional rights. Defendant's failure to raise those contentions in the trial court bars them on appeal. (*Anderson,*

exculpatory evidence. (See *People v. Espinoza* (1992) 3 Cal.4th 806, 818 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

*supra*, 25 Cal.4th at p. 592, fn. 17.) And, in view of our determination that the photographs were properly admitted, neither defendant's right to due process nor to the effective assistance of counsel was violated. (*Farnam*, *supra*, 28 Cal.4th at p. 186, fn. 36.)

### C. *Denial of Motion for Mistrial*

 Defendant identifies four separate instances of asserted prosecutorial misconduct that were, singly or together, so prejudicial as to mandate a mistrial. As we have previously explained, a mistrial should be granted "only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala, supra*, 23 Cal.4th at p. 282.) We review the trial court's ruling for abuse of discretion and find no such abuse here. (*Ibid.*)

The first instance of asserted misconduct involved evidence that defendant had escaped. In pretrial proceedings, the prosecution agreed that defendant's escape from Riverside County Sheriff's Deputies while being transported to court did not qualify as a circumstance in aggravation under section 190.3. Subsequently, but before the retrial began, defendant attempted to escape from the county jail. The court ruled the second escape also was not admissible under section 190.3. The prosecution agreed not to offer either as a circumstance in aggravation.

A reference to an escape nonetheless occurred during the testimony of defendant's sister, Julie Steffani. Steffani testified that defendant had undergone a spiritual conversion shortly before his arrest for murder, that he let go of his hostility towards the prison, and that there was now "a real peacefulness about him." On cross-examination, the district attorney inquired whether Steffani was aware defendant had "escaped from the jail during the time he supposedly underwent this religious conversion." Steffani said she was. Defense counsel, who had earlier conceded the escape could be relevant impeachment to certain types of character evidence, objected and requested a mistrial. The court sustained the objection and admonished the jury to disregard the mention of an escape, but denied a mistrial. The court, referencing its earlier order under section 190.3, also expressed its belief that the district attorney's question had been contemptuous and subsequently held the prosecutor in contempt.

Defendant notes a second escape reference, which occurred during the cross-examination of defendant's psychiatric expert, Dr. Lorna Forbes. The district attorney inquired whether an escape or attempted escape would affect her diagnosis, but the trial court promptly sustained the defense objection.

We do not agree the isolated references to an escape, immediately followed by an admonition to disregard them, mandated a mistrial. In the absence of evidence to the contrary, we presume the jury heeded the admonition. (*People v. Wash* (1993) 6 Cal.4th 215, 263 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) We also note the fact the escape was inadmissible as an aggravating factor did not render it inadmissible on cross-examination to rebut good character evidence offered by defendant. (*People v. Fierro* (1991) 1 Cal.4th 173, 237 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) In particular, the trial court did not have the benefit of our opinion in *Farnam, supra*, 28 Cal.4th at pages 187-188, in which we permitted the defendant to be cross-examined about his nonviolent escape while being transported to juvenile hall to impeach a favorable characterization of his behavior in custody.

The second asserted instance of misconduct involved evidence that defendant had engaged in uncharged robberies with Nola England. Under cross-examination by the district attorney, England testified without objection that she had purchased the murder weapon from DeYoung for defendant to use as protection during the robberies she and defendant were committing. The district attorney, on further examination of England, returned to the issue of the gun's provenance. England reiterated that she had purchased the gun for defendant's protection when he was committing a robbery. The court promptly sustained the defense objection and ordered the jury to disregard the reference to a robbery.

Once again, we presume the jury obeyed the court's admonition to disregard the robbery. And, even if it did not, the single reference to another robbery was assuredly harmless, inasmuch as England had already testified—without objection—that she and defendant had committed uncharged robberies. Moreover, Dr. Forbes had earlier testified that defendant had admitted committing robberies for drug money. He told her he "got away with" the robberies, except for the December 1969 liquor store robbery. The apparent purpose of this evidence was to bolster the defense of lingering doubt by contrasting defendant's denial of involvement in the Arias murder with his willingness to admit *other* crimes, including those for which he was never arrested. Under the circumstances, then, England's brief references to uncharged robberies could not have prejudiced defendant.

The third asserted instance of prosecutorial misconduct involved the threat made against England's life by defendant and conveyed to England by LeRoy Yant. The court instructed the jury not to consider the threat for its truth but only as it might relate to England's credibility. Defendant contends the prosecutor erred (1) in eliciting evidence of criminal activity beyond that

listed in his statement of aggravation, and (2) in failing to disclose the existence of the threat to the defense. We find no error.

Evidence of criminal activity that is not included in the list of aggravating factors may still be admissible for other purposes. (*People v. Fierro, supra,* 1 Cal.4th at p. 237.) In this case, as the trial court found, the threat was relevant to England's credibility. (*People v. Williams* (1997) 16 Cal.4th 153, 211-212 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

We also reject defendant's contention that the prosecution had a duty under *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] to disclose evidence of the threat to the defense. ▮▮▮ *Brady* requires disclosure " ' "only of evidence that is both *favorable* to the accused and 'material either to guilt or to punishment.' " ' " (*People v. Memro* (1995) 11 Cal.4th 786, 837 [47 Cal.Rptr.2d 219, 905 P.2d 1305], italics added.) ▮▮▮ As defendant concedes, the threat evidence was not favorable to him. The prosecution therefore had no federal constitutional duty to disclose it. (*U.S. v. Flores-Mireles* (8th Cir. 1997) 112 F.3d 337, 340 ["There is no duty to disclose evidence that is . . . neutral, speculative, or inculpatory"]; *U.S. v. Arias-Villanueva* (9th Cir. 1993) 998 F.2d 1491, 1506 [same].)

The fourth asserted instance of prosecutorial misconduct involved evidence elicited from England that defendant had been involved in a shooting at the Pussycat Theater a month before the Arias murder. During her testimony about buying guns from DeYoung on previous occasions, England stated that she had purchased a different gun from DeYoung about a month before the Arias murder but that defendant had thrown it away. The court sustained a defense objection when the district attorney asked why defendant had thrown the gun away, so he instead asked whether she had seen defendant use the gun before throwing it away. England testified she saw defendant shoot somebody at the Pussycat Theater. The trial court promptly sustained the defense objection and admonished the jury "to disregard, not to consider for any purpose, any testimony or reference to any shooting at the Pussycat Theater."

Although evidence of the shooting at the Pussycat Theater a month before the Arias murder was unquestionably more inflammatory than the other instances complained of (and of only modest relevance), still the reference was a brief and isolated one and was followed by a clear admonition not to consider it for any reason. (*People v. Williams, supra,* 16 Cal.4th at p. 255; *People v. Bell, supra,* 49 Cal.3d at p. 534.) This single moment did not irreparably damage defendant's chances of a fair trial. A jury that otherwise credited England's testimony would have had no need to rely on this isolated

remark; on the other hand, a jury that did not otherwise credit England's testimony would not have been persuaded by this brief, uncorroborated reference to another crime.

We likewise reject defendant's claim the district attorney had a constitutional duty during discovery to disclose that England had implicated defendant in the Pussycat Theater shooting. (*United States v. Xheka* (7th Cir. 1983) 704 F.2d 974, 981-982 ["There is no requirement that the Government disclose inculpatory information so the defense will not accidentally bring it out during cross-examination"]; see generally *In re E.V.* (1998) 298 Ill.App.3d 951 [233 Ill.Dec. 74, 700 N.E.2d 175, 179] ["Respondent has not cited, and our independent research has not revealed, any case where it has been held that the State has a duty to disclose potentially 'inculpatory' evidence of a separate uncharged offense"].) It also appears that defendant waived any discovery claim by failing to object on this basis below.

Finally, we do not find that the errors, cumulatively, required a mistrial, either. As we have seen, only a few of the prosecutor's actions may be characterized as misconduct, and those few improper questions were not serious enough, even in the aggregate, to have prejudiced defendant in the face of the court's unequivocal admonition on each occasion to disregard the improper evidence. (*Medina, supra,* 11 Cal.4th at pp. 760-761.) At defendant's request, the court even highlighted its admonitions in the course of instructing the jury: the court informed the jury it could be "certain" nothing that would help them fairly decide the case had been excluded, warned the jury not to mention or consider the improper remarks for any purpose, and explained that a verdict based on such matters would result in a mistrial. Defendant offers no reason to think these sharply worded warnings did not "counteract fully whatever prejudice to the defendant resulted from the prosecutor's remarks." (*People v. Bolton* (1979) 23 Cal.3d 208, 216, fn. 5 [152 Cal.Rptr. 141, 589 P.2d 396].)

D. *Response to the Jury's Note During Deliberations*

During deliberations, the jury foreperson submitted a note to the court asking for "help" with some "difficulty" the jurors were having. The note listed the following complaints: One juror "keeps demanding testimony to be read." When the others did not believe the readback is necessary, this juror refused to discuss "what it is that this person is looking for in the testimony" or to describe the question that might be answered by the testimony. The juror slept "through most of the testimony that is being read for this person." The same person also "refuses to meet at the times the other 11 wish to meet" and forced the jury to take off Fridays by refusing to come in. This

juror also failed to join in the discussion "except once in a while to make a personal attack on another juror." "The other 11 of us," the note concluded, "real[ly] wish to deliberate and come to an intelligent decision for Mr. Burgener."

On receiving the note, the court noted that, according to the court reporter, most of the jurors were not interested in the readbacks and that this juror, "it appears, may be getting extra pay and taking off weekends and delaying this entire thing by having loads and loads of testimony reread that should have been paid attention to in the first place. This is a ridiculous situation." The defense requested the entire jury be admonished as to their duties, including their duty to refrain from the conduct described in the note and to deliberate in good faith, and the foreperson be directed to advise the court if the problem persisted, which would permit the court to conduct a further inquiry. The court agreed to do so and added that it would advise the jurors they "should meet at times that are convenient to them collectively."

The court brought the jury in, read the note aloud, and responded in accordance with its earlier statements:

"It is your duty, in fact, you have been sworn to well and truly try the case and a true verdict render in accordance with the law and pursuant to the evidence.

"Since it is a jury of 12, it is the duty of each to cooperate and collectively discuss and to deliberate meaningfully, and it is not proper for a single juror to be holding out for special times, or special reading, or anything else. It is the duty to cooperate, to in good faith deliberate.

"It was the duty of all of the jurors in the first place to pay attention throughout the trial to all of the testimony.

"I think that it is the duty of you to go back, all of you, including whoever that juror is, to cease that conduct and to commence cooperation, commence to deliberate meaningfully and to do so on a democratic basis.

"If this problem persists, I would ask that the Court be made aware that it has not been resolved and that the same problem continues. If it does, we will probably have to conduct a thorough investigation and take whatever action is appropriate.

"I hope that you will heed my words and deliberate, come in with a good-faith determination, if you possibly can do so, as to what it is.

"There are only two choices that you have. One is either this case is a proper case for imposition of the death penalty, or the other, this is a case proper that life in prison without the possibility of parole should be imposed. Those are the only two choices. I would sure hope that you could try in good faith to decide which one.

"With that, please continue to deliberate, only with the corrections that I have indicated that should take place by whoever it is.

"If it persists and is not resolved so that meaningful deliberation can continue, I would ask, [foreperson], that you bring that to our attention.

"Thanks. Please deliberate."

Defense counsel made no objection to the court's response.

The next day, the jury announced that it had reached a verdict. Defense counsel, after noting that the verdict came "so quickly" after the court's admonition, for the first time remarked that its language had been "somewhat stronger than I had anticipated" and charged that it came "very close to telling the juror that if he didn't change his attitude and cooperate, he could be in contempt of court and could end up going to jail." The court declared its intent to poll the jury to ensure their individual verdict had not been influenced by anything the court had done or said.

After the clerk read the verdict of death, the court polled the jurors individually to verify that this was their verdict. The panel also answered "yes" when asked whether the verdict had been "conscientiously arrived at in good faith, after an evaluation of all of the evidence and applying the principles of law that were received during this trial" and answered "no" when asked whether anyone had been "coerced in the verdict that you have rendered."

 Defendant now contends the court erred in failing to question the accused juror in private to ascertain the nature of the problem and in making statements that coerced a verdict.

 The decision whether to investigate the possibility of juror bias, incompetence, or misconduct rests within the sound discretion of the trial court. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225] (*Cleveland*).) A hearing is *required* only where " 'the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Ibid.*)

■ The allegations here did not require the court to conduct a hearing. As we observed in *Cleveland,* it often is appropriate for a trial court that questions whether a juror is participating in deliberations in good faith instead "to reinstruct the jurors regarding their duty to deliberate and to permit the jury to continue deliberations before making further inquiries that could intrude upon the sanctity of deliberations." (*Cleveland, supra,* 25 Cal.4th at p. 480.) That, of course, is what the trial court did here. Its admonition reminded the jury of their duties to cooperate and deliberate in good faith. ■ The admonition also directed the foreperson to report any further problems so the court could conduct an investigation—which, again, accords with our discussion in *Cleveland* "that when reinstruction does not resolve the problem and the court is on notice that there may be grounds to discharge a juror during deliberations, it must conduct 'whatever inquiry is reasonably necessary to determine' whether such grounds exist." (*Ibid.*)

■ Defendant contends the court's comments were perceived as a threat by the juror to change his vote and, as proof, offers a declaration from a juror who claims he was the juror (wrongly) accused of misbehavior in the foreperson's note to the court. ■ But evidence of the juror's state of mind and the admonition's effect on it is not admissible. (Evid. Code, § 1150; *Cleveland, supra,* 25 Cal.4th at p. 475.) ■ Moreover, defendant's request that the court give the admonition it did, if it does not constitute invited error, at the least bars him from challenging it on appeal. (*Rodrigues, supra,* 8 Cal.4th at p. 1193; *People v. Jennings* (1991) 53 Cal.3d 334, 384 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [100 Cal.Rptr.2d 845]; see also *People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235].)

In any event, we do not believe the court's remarks, viewed as a whole, had a coercive connotation. (*People v. Keenan* (1988) 46 Cal.3d 478, 534 [250 Cal.Rptr. 550, 758 P.2d 1081].) As in *Keenan,* the court here did not insist that a deadlock be resolved, urge minority jurors to give special attention to majority views, or suggest that failure to reach a decision would have any specific consequences. (*Ibid.*) Indeed, the court had no knowledge (nor do we) that any deadlock existed. (Cf. *Early v. Packer* (2002) 537 U.S. 3, __ [123 S.Ct. 362, 363, 154 L.Ed.2d 263] [denying habeas corpus relief even where the court knew the jury's "last vote count had been 11 to 1"].) We also do not find prejudicial the court's statement that it would have to conduct an "investigation" if the problems persisted. (*Keenan, supra,* 46 Cal.3d at pp. 535-536.) Here, as in *Keenan,* defendant "never took issue with the court's remarks to the jury about an investigation. Thus, at the least, 'the potential for coercion argued now was not apparent to one on the spot.' " (*Id.*

at p. 535, quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240 [108 S.Ct. 546, 552, 98 L.Ed.2d 568].)

Finally, we do not understand the court's remarks to have prevented any juror from requesting a readback of testimony. The problem identified in the foreperson's note, which was read to the jury, was that the juror requesting readbacks had refused to explain "what it is that this person is looking for in the testimony" or to identify a question "that might have been answered by the testimony." In response, the court instructed the jurors "to cease that conduct and to commence cooperation." Although any juror may request a readback of testimony (§ 1138), a request may not be used solely to vex or annoy the other jurors or to delay the proceedings.

In short, no impropriety appears in the court's response to the jury's note.

### E. *Alleged Ineffectiveness of Counsel*

Defendant claims next that his attorney's substandard performance deprived him of his right to the effective assistance of counsel under the state and federal Constitutions. ■■■ To demonstrate ineffective assistance of counsel, a defendant must show that counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674].) To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Id.* at p. 694 [104 S.Ct. at p. 2068].) Because we are limited to the record on appeal, we must reject the contention that counsel provided ineffective assistance if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation. (*Farnam, supra,* 28 Cal.4th at p. 201.)

#### 1. *Advocacy issues*

■■■ Defendant claims that his attorney failed to represent him zealously and instead aligned himself with the prosecution. The four instances identified by defendant do not support his claim.

Defendant's criticism of counsel's handling of the *Duren* motion is unfounded. Defendant faults counsel for complimenting the jury commissioner and for speculating about the possible "common sense" justifications for the disparities he had identified. The former does not betray deficient performance, inasmuch as a *Duren* claim does not require proof of purposeful

discrimination. (See *Duren v. Missouri, supra*, 439 U.S. at p. 368, fn. 26 [99 S.Ct. at p. 670].) The latter point also fails to support defendant's argument. Counsel's statements, in context, were directed to the *People's* burden of justifying the disparity once a prima facie case has been set forth (see *id.* at p. 368 [99 S.Ct. at pp. 670-671]) and their purpose was to alert the court, notwithstanding the appeal of such inferences, that "there is nothing in the record from which we can draw these inferences." Inasmuch as defendant failed to present a prima facie case of exclusion, defendant has no complaint. Moreover, counsel's argument also supported the contention—reiterated by defendant on appeal—that certain disparities inhered in the voter and Department of Motor Vehicles lists, requiring the development of "other lists which might include more of the poor or youths." We have rejected *that* claim, not because counsel's advocacy was inadequate, but because the claim was legally untenable.

Defendant then faults counsel for conceding the autopsy photographs were not cumulative and that the district attorney had been careful in selecting them. The concession does not demonstrate incompetence: photographs are not cumulative simply because they illustrate facts otherwise presented through testimony. (*Farnam, supra*, 28 Cal.4th at p. 185.) Counsel's comments merely highlighted the gravamen of his objection, which was not that the photographs were cumulative or too numerous, but that they were unduly prejudicial. Our rejection of that claim was not attributable to counsel's performance, but (again) to the claim's lack of merit.

Next, defendant complains that counsel elicited from the pathologist evidence that only the bullet wound to the liver might have been fatal and that Arias might have survived the face wound. It appears that counsel may have wanted to show the jury the five bullet wounds were not the product of a callous, cold-blooded killing by a professional, but were instead the panicked attack of an amateur. We cannot say that such a strategy was unreasonable under the circumstances.

Finally, we do not agree that counsel was deficient in failing to argue the financial burdens of an execution on the public fisc. The relative costs of imprisonment and execution are not relevant to a jury's penalty determination. (*People v. Benson, supra*, 52 Cal.3d 754, 807.)

2. *Evidentiary issues*

Defense counsel chose not to call defendant's brother, Christopher Burgener, who "was very evidently intoxicated" when he arrived at court. Counsel felt he could not "put on a witness in that condition" and discharged

him. Defendant now contends that counsel thereby missed an opportunity to corroborate Becky Jurs's uncontradicted testimony that several of defendant's siblings—including Christopher—were alcoholics. The claim is meritless. As defendant concedes, the trial court would not have permitted Christopher to testify in his inebriated state. We also reject defendant's apparent assumption that his constitutional right to the effective assistance of counsel nonetheless obligated his attorney to attempt such stunts as having Christopher try to stumble into the courtroom or engaging Christopher in conversation within earshot of the jury. Defense counsel quite reasonably could have concluded that these underhanded tactics would backfire.

Defendant then complains about how counsel characterized the rifle used in the 1969 liquor store robbery. Robert Palla testified that he "heard an audible click, like the rifle was being fired, but there was no report of a shell." The district attorney argued to the jury that the rifle failed to discharge because it had been loaded backwards. Defense counsel responded that there *also* must not have been a cartridge in the chamber, since the breech could not have closed if the cartridge had been inserted backwards. In defendant's view, counsel should have simply agreed that the rifle had been loaded backwards and then argued that defendant's inexperience with weapons in 1969 rendered it unlikely he had been the shooter in the 7-Eleven over a decade later. Counsel's actual strategy, in which he argued that the failure to place a cartridge in the chamber *and* to check how the magazine was loaded was compelling evidence that defendant was not a cold-blooded killer, seems to us the more persuasive one and, in any event, was certainly reasonable.

Finally, we reject defendant's claim that his attorney was incompetent in failing to prepare him to testify. Counsel chose not to have defendant review his testimony at the prior trial before testifying so that he would appear honest and unrehearsed to the jury. Counsel instead discussed with defendant the favorable and unfavorable evidence in the case "in great detail" and "at great length." Defendant offers no authority to suggest this was an unreasonable strategy. Moreover, near the end of his testimony, defendant was given the opportunity to review his prior testimony and said he did not wish to correct any of his current testimony. Defendant thus cannot show that his testimony would have been different had he first reviewed his prior testimony. (*People v. Hines* (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

### 3. *Investigation issues*

Nola England testified at defendant's guilt phase trial. In preparation for the penalty retrial, defense counsel sent his investigator to interview England

in May 1987, and she cooperated with that interview. The following winter, counsel discovered he did not have England's address or other contact information. The district attorney represented he would make arrangements for England to appear at trial, since she was not interested in speaking to the defense further or in having her whereabouts disclosed to them.

Defendant now claims counsel was incompetent for failing to reinterview England and thereby discover she would implicate defendant in uncharged robberies, the Pussycat Theater shooting, and threats against her. We disagree. Counsel already had England's prior testimony at the preliminary hearing and at the first trial *and* had interviewed her again before the retrial. He had no reason to believe that another interview would have been fruitful. (*United States v. Schaflander* (9th Cir. 1984) 743 F.2d 714, 721.) In fact, he had ample grounds to believe further contact with England would have been futile. (See *Strickland v. Washington, supra*, 466 U.S. at pp. 690-691 [104 S.Ct. at pp. 2065-2067].) Defendant's assertions that England would have "caved in and talked to the defense investigator if confronted directly" and "very likely" would have mentioned the uncharged robberies, the Pussycat Theater shooting, and the threats during this hypothetical conversation is rank speculation.

Defendant's additional contention that counsel should have further investigated England's and DeYoung's statements to Sergeant Zavetz about the Pussycat Theater shooting and thereby have discovered England would claim defendant had been involved is undermined by his admission that those statements "did not implicate [him] at all."

Finally, there was a conflict in the evidence whether the public defender's office had been timely informed that England might accuse defendant of the Pussycat Theater shooting. Accordingly, it is not possible on this record to show that counsel's performance was deficient, even if we assume that such knowledge would have triggered a duty to investigate further. Inasmuch as the jury was admonished to disregard the solitary reference to the Pussycat Theater shooting, defendant cannot show that he was prejudiced by any oversight, either.

4. *Pretrial statement to potential jurors*

Defendant argues that once the trial court denied his request to explain to prospective jurors why the penalty had been reversed, counsel should have taken steps to ensure the jury was not told that a prior jury had sentenced defendant to death. Although the court did advise the venire the case was "here for a retrial," the jury was not told a prior jury had sentenced

defendant to death. Moreover, counsel could reasonably have chosen to have the jury learn of the prior verdict, either to emphasize the solemnity of the jury's task (e.g., *Hopt v. Utah, supra,* 120 U.S. 430, 442 [7 S.Ct. 614, 620] ["The fact that previous trials had proved unavailing may perhaps have induced greater care and caution on the part of the jury in the consideration of the case"]) or to explain the improvement in defendant's behavior in prison. (*People v. Anderson, supra,* 52 Cal.3d 453, 468.)

### 5. *Cumulative ineffective assistance of counsel*

Having found no ineffective assistance, we necessarily reject defendant's claim of cumulative error. (*People v. Gurule* (2002) 28 Cal.4th 557, 662 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

### F. *Cumulative Error*

Defendant argues that even if no single error requires reversal of the penalty verdict of death, the cumulative effect of the errors must be deemed sufficiently prejudicial to warrant this remedy. Defendant has demonstrated few errors, and we have found each possible error to be harmless when considered in isolation. Considering them together, we likewise conclude their cumulative effect does not warrant reversal of the judgment.

### G. *Constitutionality of California's Death Penalty Statute*

■■■ Defendant asserts that several features of this state's capital sentencing scheme violate the federal Constitution, but, as he concedes, we have repeatedly rejected those claims.

Section 190.2, despite the number of special circumstances it includes, adequately performs its constitutionally required narrowing function. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384].)[7] Prosecutorial discretion, within those limits, to determine which defendants merit the death penalty does not render the scheme invalid.

---

[7]Defendant also contends that California's death penalty law is unconstitutional on the ground that section 190.2 has failed to "narrow the death-eligible class to less than 50% of first degree murders generally." However, " 'defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law.' " (*People v. Michaels* (2002) 28 Cal.4th 486, 541 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Moreover, we do not understand the constitutional principle barring cruel and unusual punishment to rest solely on a system of numerical accounting. Rather, the governing statutes must rationally narrow the death-eligible class in a *qualitative* manner—as California's statutes do. (*People v. Frye* (1998) 18 Cal.4th 894, 1028-1029 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

(*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Factor (a) of section 190.3, which directs the jury to consider the circumstances of the offense, is not unduly vague on its face (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-980 [114 S.Ct. 2630, 2636-2639, 129 L.Ed.2d 750]) or as applied. (*Jenkins, supra*, 22 Cal.4th at pp. 1052-1053.) The Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty. (*Anderson, supra*, 25 Cal.4th at p. 601.) Nor does it require the jury to return unanimous written findings supporting its verdict. (*Ibid.*) The Constitution also does not require the jury be instructed as to any burden of proof in selecting the penalty to be imposed. (*Jenkins, supra*, 22 Cal.4th at p. 1053-1054.) It is settled that intercase proportionality review is not required as a matter of due process, equal protection, fair trial, or cruel and/or unusual punishment concerns. (*Anderson, supra*, 25 Cal.4th at p. 602.) The inclusion in the section 190.3 list of potential mitigating factors of adjectives such as "extreme" (factors (d), (g)) and "substantial" (factor (g)) does not act as a barrier to the jury's consideration of mitigating evidence. (*People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].) And it was not error to fail to instruct the jury as to which factors were aggravating and which factors were mitigating. (*Anderson, supra*, 25 Cal.4th at p. 601.)

Finally, defendant also asserts, without citation to authority, that sentencing him to death is "grossly disproportionate" to his crime of robbery murder. It is not. (E.g., *People v. Hill* (1992) 3 Cal.4th 959, 1014 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

## H. *Asserted Violation of International Law*

Defendant contends the alleged violations of law he has described above also constituted violations of customary international law. As in *People v. Hillhouse* (2002) 27 Cal.4th 469 [117 Cal.Rptr.2d 45, 40 P.3d 754], we need not consider whether a violation of state or federal constitutional law would also violate international law, " 'because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law . . . .' " (*Id.* at p. 511.) "Moreover, had defendant shown prejudicial error under domestic law, we would have set aside the judgment on that basis without recourse to international law." (*Ibid.*)

## I. *Postverdict Issues*

### 1. *The substitution of Judge Heumann to hear defendant's motion to modify the verdict*

As stated, the jury at the penalty phase retrial again returned a verdict of death, but the trial judge granted defendant's application to modify the

verdict under section 190.4, subdivision (e) and sentenced defendant to life without the possibility of parole. The court subsequently denied defendant's motion for a mistrial as moot and never ruled on his motion for a new trial. The Court of Appeal reversed on the ground that improper factors "individually and collectively permeated, and to some extent dominated, the reviewing, reweighing, and rebalancing process by the trial court" that led to the verdict modification (*People v. Burgener, supra,* 223 Cal.App.3d at p. 435) and remanded for the court "to reconsider and rule upon the motion in accordance with the factors listed in Penal Code sections 190.4, subdivision (e), and 190.3 and no others." (*Id.* at p. 430.) "Preferably, the trial judge, J. William Mortland, should reconsider and decide all three motions. If, however, he is unavailable, the motion to modify and the motion for new trial may be heard before another judge of the same court." (*Id.* at p. 436.)

At the time the Court of Appeal issued its opinion, Judge Mortland had already retired. When the Presiding Judge of the Riverside County Superior Court contacted Judge Mortland to ask whether he nonetheless wanted to hear the matter, Judge Mortland declined for health reasons. The case was then reassigned, without objection, to Judge Ronald R. Heumann.

On March 29, 1991, Judge Heumann, after reviewing the evidence and the arguments at the penalty trial, denied defendant's application to modify the verdict. One month later, defendant for the first time objected the court had failed to convene a hearing as to Judge Mortland's availability and had failed to make a finding that he was indeed unavailable. On May 10, 1991, at the hearing on defendant's objections, Judge Heumann reviewed the circumstances leading to his assignment, noted that defendant had failed previously to raise any objection to it, and added that Judge Mortland had confirmed his unavailability in a telephone call the previous day. Judge Mortland reiterated his unavailability in a sworn declaration dated June 1, 1991.

▮ In this court, for the first time, defendant contends the substitution of Judge Heumann for Judge Mortland violated his Sixth Amendment right to a jury trial, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment state-created liberty interest and right to due process. It is elementary that defendant waived these claims by failing to articulate an objection on federal constitutional grounds below. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1231, fn. 17 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) His claims are barred for the additional reason that he waited until Judge Heumann had ruled on the application to modify the verdict before objecting to the substitution. (*People v. Scott* (1997) 15 Cal.4th 1188, 1207 [65 Cal.Rptr.2d 240, 939 P.2d 354]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1211-1212 [275 Cal.Rptr. 729, 800 P.2d 1159].)

Were we to permit review under these circumstances, a defendant would be discouraged from making timely objections since, if the ultimate judgment were unfavorable, the defendant "would receive a second 'bite at the apple'. . . ." (*People v. Hull* (1991) 1 Cal.4th 266, 273 [2 Cal.Rptr.2d 526, 820 P.2d 1036].)

In his reply brief, defendant contends that his attorney's failure to preserve these claims constituted ineffective assistance of counsel. The claim must fail. " 'There are, no doubt, an infinite number of reasons why counsel would not avail themselves of the opportunity to disqualify a judge. The failure to do so is within the competence of counsel, and does not show ineffective counsel.' " (*People v. Scott, supra,* 15 Cal.4th 1188, 1213.)

Defendant for the first time also asserts that the hearing before Judge Heumann violated the state and federal constitutional guarantees against double jeopardy. This claim, too, has been waived, but we will nonetheless consider it through the lens of ineffective assistance of counsel. (*People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Defendant contends that Judge Mortland's modification of the verdict in 1988 was equivalent to an acquittal and barred further proceedings on penalty. He relies on *Bullington v. Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (*Bullington*) and *Arizona v. Rumsey* (1984) 467 U.S. 203 [104 S.Ct. 2305, 81 L.Ed.2d 164] (*Rumsey*). Neither supports a claim of double jeopardy here.

In *Bullington*, a jury convicted defendant of capital murder which, under Missouri law, was punishable by either death or life imprisonment without eligibility for parole for 50 years. (*Bullington, supra,* 451 U.S. at pp. 432, 435-436 [101 S.Ct. at pp. 1854-1855, 1856-1857].) At the "second stage" (*id.* at p. 432 [101 S.Ct. at pp. 1854-1856]), the same jury heard evidence, weighed the aggravating and mitigating circumstances, and returned an "additional verdict" fixing defendant's punishment at imprisonment for life without eligibility for parole for 50 years. (*Id.* at p. 436 [101 S.Ct. at pp. 1856-1857.) Subsequently, the trial court granted Bullington's motion for a new guilt phase trial. The United States Supreme Court held that the double jeopardy clause barred the prosecution from seeking the death penalty in the new proceeding. (*Id.* at pp. 446-447 [101 S.Ct. at pp. 1862-1863].) "By enacting a capital sentencing procedure that resembles a trial on the issue of guilt or innocence, . . . Missouri *explicitly requires* the jury to determine whether the prosecution has 'proved its case.'. . . [T]he sentence of life imprisonment which petitioner received at his first trial meant that 'the jury has already acquitted the defendant of whatever was necessary to impose the death sentence.' " (*Id.* at pp. 444-445 [101 S.Ct. at p. 1861].)

The Arizona procedure in *Rumsey* was similar to Missouri's, except that the judge—not the jury—conducted the separate sentencing hearing to determine whether to sentence a first degree murder defendant to death or life imprisonment without possibility of parole for 25 years. (*Rumsey, supra,* 467 U.S. at pp. 205-206, 209-210 [104 S.Ct. at pp. 2306-2307, 2309-2310].) When the judge failed to sentence Rumsey to death, the state supreme court sustained the prosecution's appeal of the sentence. The United States Supreme Court held that the judge's "verdict" (*id.* at p. 208 [104 S.Ct. at pp. 2308-2309])—like the jury's in *Bullington*—amounted to "an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty." (*Id.* at p. 211 [104 S.Ct. at p. 2310].)

Unlike in *Bullington* and *Rumsey,* defendant has not been "acquitted" of whatever was necessary to receive the death penalty. Rather, the trier of fact—here, the jury—unanimously found that death was the appropriate penalty. By exercising his discretion to modify the verdict under subdivision 7 of section 1181 (see § 190.4, subd. (e)), Judge Mortland had "no authority to acquit the defendant expressly, impliedly or inadvertently." (*People v. Serrato* (1973) 9 Cal.3d 753, 762 [109 Cal.Rptr. 65, 512 P.2d 289]; *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101, __ [123 S.Ct. 732, 732-739, 154 L.Ed.2d 588].) Since appellate review of his postverdict ruling presented no threat of multiple punishment or successive prosecutions, the double jeopardy clause is not offended. (*People v. Statum* (2002) 28 Cal.4th 682, 693-694 [122 Cal.Rptr.2d 572, 50 P.3d 355].)

■ Next, defendant renews his argument that Judge Heumann erred in failing to accord sufficient weight to the declaration submitted by Judge Mortland, in which he stated that he "did and still does" consider the improper grounds identified by the Court of Appeal "irrelevant" and therefore still believed that the appropriate sentence was life without the possibility of parole and that the application to modify the verdict should be granted. Judge Heumann read the declaration but concluded that "it carries no weight because it has no bearing upon what the jury made their determination." Judge Heumann was correct. The task of a judge under section 190.4, subdivision (e) is to review the *evidence* and, guided by the aggravating and mitigating circumstances set forth in section 190.3, make a determination whether the jury's decision that the aggravating circumstances outweigh the mitigating circumstances is contrary to law or the *evidence presented.* The evidence presented, of course, refers to "the evidence presented to the jury." (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892] [improper to consider probation report]; *People v. Lang* (1989) 49 Cal.3d 991, 1044 [264 Cal.Rptr. 386, 782 P.2d 627] ["the trial court is prohibited by statute from considering, when ruling on the

modification motion, any evidence not presented to the jury during the trial"]; *People v. Burgener, supra,* 223 Cal.App.3d at p. 435, fn. 3.)[8]

Defendant's suggestion that the Eighth Amendment and *Lockett v. Ohio* (1978) 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] compelled Judge Heumann to accord determinative weight to Judge Mortland's declaration is unpersuasive. *Lockett* decried a statute that prevented the sentencer from considering "aspects of the defendant's character and record" and "circumstances of the offense proffered in mitigation." (*Id.* at p. 605 [98 S.Ct. at p. 2965] (plur. opn. of Burger, C. J.).) Judge Mortland's *views* as to defendant's character or the circumstances of the offense, gleaned solely from the penalty retrial, are not themselves *evidence* bearing on those points. (*People v. Mayfield* (1993) 5 Cal.4th 220, 226 [19 Cal.Rptr.2d 877, 852 P.2d 372].)

As a companion to the foregoing, defendant argues that Judge Heumann erroneously exceeded the scope of the remand authorized by the Court of Appeal. He points out that the Court of Appeal had "no problem" with "the extent to which the trial court independently reweighed the evidence, considered lingering doubt regarding guilt as a mitigating factor, and rebalanced the aggravating and mitigating circumstances" and found that his "statements during the reweighing and balancing process amounted to sufficient findings and reasons." (*People v. Burgener, supra,* 223 Cal.App.3d at p. 434.) Defendant reasons that the remaining task on remand was merely to subtract the improper factors from the analysis and issue a new ruling.

Although defendant waived this claim by failing to assert it in a timely manner below, we also find it is meritless. The Court of Appeal remanded for "reconsideration of the motion" for modification. (*People v. Burgener, supra,* 223 Cal.App.3d at p. 435.) Although the trial court was directed to do so "in accordance with the views expressed in this opinion" (*ibid.*), this language merely advises the superior court of the reasons for the remand. (*People v. Sheldon* (1994) 7 Cal.4th 1136, 1142 [31 Cal.Rptr.2d 368, 875 P.2d 83].) The judge hearing the application for modification was still obligated to reweigh the evidence and make an *independent* determination whether the weight of the evidence supported the verdict of death. (*Id.* at pp. 1142-1143.) In making that ruling, Judge Heumann was not bound to adopt Judge Mortland's views on subsidiary issues, whether expressed at the initial hearing or through a declaration following his retirement. (Cf. *People*

---

[8]It follows that the prosecution committed no misconduct in urging Judge Heumann not to consider the declaration (see *People v. Smithey* (1999) 20 Cal.4th 936, 1000-1001 [86 Cal.Rptr.2d 243, 978 P.2d 1171]) and that defendant was not thereby deprived of any state-created liberty interest (see *People v. Frye, supra,* 18 Cal.4th at p. 1026).

v. *Berryman* (1993) 6 Cal.4th 1048, 1107 [25 Cal.Rptr.2d 867, 864 P.2d 40] ["the court is required to review the verdict of death itself and not any underlying 'findings'"].) Inasmuch as the Court of Appeal found that Judge Mortland had so injected improper factors into his "review of the evidence, reweighing such and rebalancing aggravating and mitigating factors" such that the two could not be separated (*People v. Burgener supra,* 223 Cal.App.3d at p. 435), no error appears.

Finally, defendant invites us to revisit the correctness of the 1990 Court of Appeal ruling vacating Judge Mortland's modification of the verdict. As the People point out, the Court of Appeal ruling is law of the case. (*People v. Stanley, supra,* 10 Cal.4th at pp. 786-787.) Defendant invokes the exception for unjust decisions, i.e., "where there has been a 'manifest misapplication of existing principles resulting in substantial injustice.'" (*Id.* at p. 787.) However, he fails to identify any existing principles that were manifestly misapplied by the appellate court. He merely disagrees with the Court of Appeal's finding that Judge Mortland's repeated reference to improper factors "permeated, and to some extent, dominated," the reviewing process, rendering it impossible to say that his error was harmless. (*People v. Burgener, supra,* 223 Cal.App.3d at p. 435.) Even if we were inclined to disagree with the Court of Appeal's result, nothing in that court's analysis betrays a *manifest* misapplication of existing principles. (*People v. Stanley, supra,* 10 Cal.4th at p. 788.) Moreover, the injury suffered by defendant—a conscientious review of the matter by another judge—is hardly the type of substantial injustice contemplated by our precedents.

Accordingly, we reject defendant's multiple challenges to the substitution of Judge Heumann to hear the application to modify the jury's verdict of death.

### 2. *The denial of defendant's motion to modify the verdict*

■ Defendant then contends that Judge Heumann failed to discharge his statutory duty to reweigh the evidence and determine whether, in his independent judgment, the evidence supported the verdict of death. This contention has merit.

Under section 190.4, subdivision (e), a capital defendant is automatically deemed to have applied for a sentence modification. The statute provides that the judge hearing that application "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances

outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) Although the statute does not so state, we have interpreted this subdivision to require the judge to make an *independent* determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and applicable law. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113].) Thus, in ruling on the application for modification of the verdict, " 'the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict.' " (*Rodrigues, supra,* 8 Cal.4th at p. 1196.)

The record here contains no indication that the judge understood his duty to independently reweigh the evidence and make an independent determination whether the evidence supported the verdict of death. Indeed, the court's statements betray reliance on a lesser standard of review. After quoting the relevant portion of the statutory text, the court stated: "I don't know exactly what that means, but I assume it means to review the aggravating factors listed in [section] 190.3 to determine if the jury could find that the aggravating circumstances outweigh the mitigating factors. [¶] In doing this, I look to see if there was evidence on each of the factors and, if so, could the jury, based upon such evidence, find as they did?" This articulation bears a disturbing resemblance to the deferential substantial-evidence standard. (E.g., *People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225] [whether evidence is reasonable, credible, and of solid value such that the jury " 'could find' " as they did].)

Unfortunately, the remainder of the court's comments offers no assurance the court was aware of and exercised its independent judgment. At no point did the court indicate that it had undertaken an independent review of the evidence or balancing of the aggravating and mitigating circumstances. Rather, the court consistently deferred to the jury's implied findings. As to section 190.3, factor (b), for example, the court said, "The People contend and the jury could have believed that murder, not robbery, was the real motive for the crime." In discussing factor (k), the court again avoided expressing its own views as to the significance of the two $5 bills found in the crumpled 7-Eleven paper bag recovered from England's apartment: "This could be interpreted, as the defendant contends, as a clear sign he was set up by his former girlfriend and her former boyfriend to take the fall in this matter or it could be interpreted, as the People contend, [as] a sign that the robbery was not the real motive and that the crime did not exhibit a high degree of intelligence to start with." The court likewise observed that "the jurors apparently were not swayed by the testimony about weapons in

prison, defendant's early life and juvenile record or the severe paranoia he's alleged to have suffered from" and that the "jurors also apparently did not accept the defendant's theory of lingering doubt about his conviction." In summing up, the court said merely that "[t]he jury had sufficient aggravating factors presented to them that I cannot say their verdict, finding the aggravating circumstances outweigh the mitigating circumstances—outweighed the mitigating circumstances, and, hence, imposing the penalty of death was contrary to law or the evidence presented."

Unlike in *People v. Mayfield* (1993) 5 Cal.4th 142, 196 [19 Cal.Rptr.2d 836, 852 P.2d 331], we cannot say the court "correctly applied the law [citation], even if it did not correctly and consistently pronounce it." Nor, on this record, can we say that the error " 'had no impact on the court's decision to deny the motion.' " (*People v. Cooper* (1991) 53 Cal.3d 771, 848 [281 Cal.Rptr. 90, 809 P.2d 865].) The court's references to the substantial-evidence standard were not mere "isolated instances," and at no point did the court manifest an intent to apply any other standard. (Cf. *People v. Mayfield, supra*, 5 Cal.4th at p. 196; see also *People v. Raley* (1992) 2 Cal.4th 870, 922 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Gonzalez, supra*, 51 Cal.3d at p. 1239.)

The court's failure to exercise its independent judgment in reviewing an application to modify the verdict under section 190.4, subdivision (e) was error. (*People v. Bonillas* (1989) 48 Cal.3d 757, 801 [257 Cal.Rptr. 895, 771 P.2d 844]; see *People v. Cunningham* (2001) 25 Cal.4th 926, 1039 [108 Cal.Rptr.2d 291, 25 P.3d 519].) We must therefore vacate the judgment of death and remand to the superior court for a new hearing on the application for modification of the verdict.[9]

As additional guidance, we will also briefly address defendant's remaining challenges to the modification hearing. We reject the notion that Judge Heumann, who did not preside at the penalty phase trial, could not fully exercise his independent judgment for the purpose of ruling on defendant's application for modification of the jury's verdict of death. It is sufficient that he reviewed the transcripts of the proceedings. (*People v. Espinoza, supra*, 3 Cal.4th 806, 830.) We also reject defendant's contention that Judge Heumann was obliged to consider favorable postverdict evidence of defendant's conduct on death row. As we have previously stated, a court ruling on a modification application is limited to the matters identified in section 190.4, which necessarily excludes any materials not presented to the jury. (*People*

---

[9]Judge Heumann should rehear the motion personally; if he is unavailable, the motion may be heard before another judge of the same court. (*People v. Bonillas, supra*, 48 Cal.3d at p. 801, fn. 14.)

*v. Holt* (1997) 15 Cal.4th 619, 694 [63 Cal.Rptr.2d 782, 937 P.2d 213].) The bar applies even to evidence that is favorable to the defendant. (*People v. Sheldon, supra,* 7 Cal.4th at p. 1140; *People v. Edwards, supra,* 54 Cal.3d at p. 847.)

### 3. *Denial of new trial motion*

■ Defendant's contention that Judge Heumann failed to discharge his duty to conscientiously consider his motion for new trial is without merit. The hearing transcript reveals that Judge Heumann was well acquainted with the briefs and the transcript of the trial and carefully considered those claims before denying the motion. Judge Heumann's comments that this court would automatically review the case, that he was "happy to have that review," and that "in a matter of this nature and this seriousness [he] would not want to be the last word" do not indicate that he was derelict in his duty to carefully consider defendant's new trial motion. They merely point out the fact such review exists and defendant's opportunity to seek relief here.

Inasmuch as we have already rejected each of the claims of error raised in the new trial motion, it follows the denial of that motion was not error. (*People v. Barnett, supra,* 17 Cal.4th at p. 1113, fn. 46.)

### DISPOSITION

The judgment of death is vacated and the cause remanded to the superior court for prompt reconsideration of the automatic application for modification of the death verdict (§ 190.4, subd. (e)). If the superior court, upon application of the appropriate standards, denies the application for modification of the verdict, it shall reinstate the judgment of death. If it grants the application, it shall enter a judgment of life without the possibility of parole. Any subsequent appeal shall be limited to issues related to the modification application. (See *People v. Bonillas, supra,* 48 Cal.3d at p. 802.)

George, C. J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—I agree in full with the majority opinion, but have a brief comment on its discussion of the motion to quash the jury venire based on underrepresentation of Black persons.

The majority discusses the United States Supreme Court's three-part test of *Duren v. Missouri* (1979) 439 U.S. 357 [99 S.Ct. 664, 58 L.Ed.2d 579]; the second prong of that test requires a defendant attacking the venire to

show "that the representation of [the excluded] group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." (*Id.* at p. 364 [99 S.Ct. at p. 668].)

Blacks constituted 4.5 percent of the population of Riverside County, but only 3.5 percent of defendant's venire. Defendant asked this court to find that Blacks were unfairly excluded from his venire by using the "comparative disparity" test, which measures the percentage difference between the proportion of Blacks in the venire and that in the county population. Here that difference is about 22 percent. The Attorney General asked us to use the "absolute disparity" test, which measures the disparity as a percentage of total population. The absolute disparity here is only 1 percent—the difference between the percentage of Blacks in the county population (4.5 percent) and the percentage for the venire (3.5 percent). The majority does not expressly choose between the competing tests. But in dictum it criticizes the comparative disparity test as distorting the underrepresentation when the group allegedly excluded is very small (maj. opn., *ante*, at p. 860), yet offers no criticism of the absolute disparity test.

For the sake of balance, and to avoid any implication that this court has an unstated preference for the absolute disparity test, I think it important to note that the absolute disparity test suffers from an even more serious defect when the group allegedly excluded is very small. If the defendant must prove an absolute disparity of more than 10 percent, as in *Swain v. Alabama* (1965) 380 U.S. 202, 208-209 [85 S.Ct. 824, 829-830, 13 L.Ed.2d 759], cited with apparent approval by the majority opinion, *ante*, at page 860, then the systematic total exclusion of any minorities comprising less than 10 percent of county population would pass constitutional inspection under *Duren v. Missouri, supra*, 439 U.S. 357. (See *Williams v. Superior Court* (1989) 49 Cal.3d 736, 751 [263 Cal.Rptr. 503, 781 P.2d 537] (conc. opn. of Broussard, J.).) Even a 5 percent absolute disparity test would permit counties to adopt jury selection methods that systematically excluded Blacks in many California counties (including Riverside County), Asians in almost all counties, and Native Americans in every county, because these minorities comprise less than 5 percent of the county population. This court should not, even by implication, endorse such a test.

Appellant's petition for a rehearing was denied April 9, 2003, and the opinion was modified to read as printed above.