Filed 9/23/15  P. v. Burnes CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>GRAHAM HARRINGTON BURNES,<br><br>        Defendant and Appellant. | B258180<br><br>(Los Angeles County<br>Super. Ct. No. MA060346) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Charles A. Chung, Judge.  Affirmed.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Graham Harrington Burnes (defendant) appeals from his three robbery convictions. He contends that substantial evidence did not support his convictions, that accomplice testimony was insufficiently corroborated, and that the trial court abused its discretion in admitting the testimony of a fearful witness. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

In an amended information, defendant was charged with three counts of second degree robbery, in violation of Penal Code section 211.[1] After a jury trial, defendant was found guilty as charged. The trial court sentenced defendant on count 1 to the upper term of five years in prison, with a concurrent five-year term each for counts 2 and 3. The court imposed mandatory fines and fees, and ordered defendant to pay direct victim restitution in the stipulated amount of $3,579. Defendant was given 61 days of presentence custody credit, consisting of 53 actual days and 8 days of conduct credit. Defendant filed a timely notice of appeal.

**Prosecution Evidence**

On the morning of March 30, 2013, defendant's brother Pierce Burnes (Pierce) committed a robbery at the Radio Shack store on Palmdale Boulevard in Palmdale. The store's assistant manager, Stephanie Contreras (Contreras) saw Pierce sitting on a nearby curb when she arrived to open the store. Just before 9:00 a.m., Pierce entered the store, pointed at Contreras what appeared to be a real gun (but was not), and stole cash, headphones, and tablet computers. He then bound Contreras's hands with zip ties and left through the back door at 9:08 a.m. Contreras triggered a silent alarm and called 911. Contreras told the 911 operator that during the ordeal, the robber told her that someone was waiting for him outside. The robbery was captured on the store's surveillance video.

Two months later, after Contreras had transferred to another Radio Shack store, a coworker there told her that an unknown older man (not defendant or Pierce) had come into the store late in the evening looking for the woman who had been robbed at

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

gunpoint.  Although there was surveillance video of the contact, the man approached the coworker sideways and looked down at the floor, so none of the cameras captured his face.  The coworker told the man she did not know what he was talking about, and the man left the store.  Contreras testified that she was frightened by the report and felt paranoid.  She called the deputy district attorney right away (although it was a weekend), and told him about incident.  She did not know the identity of the older man.

Less than two weeks later, on April 11, 2013, Pierce and his accomplice Donte Ray (Ray) robbed the AT&T Cell World store on Commerce Center Drive in Lancaster, just after manager Ilene Solaiza (Solaiza) had opened the store at 10:00 a.m.  Surveillance cameras captured that robbery, as well.  Pierce and Ray displayed what looked like real guns, and then led Solaiza to the back room where another employee, Phillip Reid (Reid), was working.  The robbers made the two employees lie down, and as Ray bound Reid with duct tape, he removed keys and a cell phone from Reid's pockets.  Pierce ordered Solaiza to open the safe, and then led her back to the sales floor to open the cash drawer, from which he removed the money before returning her to the back room to tie her up again.  After the robbers stole phones, iPads, and phone accessories, they left through the emergency exit at 10:44 a.m.

While still in the back room, Reid managed to trigger a silent alarm.  After he and Solaiza freed themselves, Solaiza called 911, and they watched through the front window of the store as Pierce and Ray attempted to flee.  The two men ran back and forth in the parking lot as though looking for something.  One of them tried to get into an occupied car by banging on the window and screaming.  Both men ran toward the nearby indoor mall as the police began to arrive.  Solaiza described the men and their flight route to the 911 operator, and Pierce and Ray were apprehended a short time later.  Officers found two duffel bags containing AT&T merchandise under a motor home in the area.

Ray, who had not yet been tried for the AT&T robbery, testified under an agreement for use immunity, hoping for lenient treatment.  He admitted that he committed the robbery with Pierce.  Ray was twice interviewed by law enforcement, once the day of the robbery and his arrest, and again in early July 2013.  Ray was a

3

longtime friend of Pierce who also knew defendant, Pierce's younger brother. All three had gone to school together. Ray denied having participated in the Radio Shack robbery, but acknowledged that Pierce and defendant had spoken to him about it the day it was committed. Pierce, defendant, and an unidentified friend came to the motel where Ray was temporarily living, and said that they had just come from the store. Pierce said they had "hit a lick," and showed Ray iPads, phones, and other items in duffel bags in the back of his SUV. Pierce said it was an AT&T or Radio Shack store. Ray knew Pierce would not do anything without someone he trusted, so he assumed that Pierce meant that he and defendant had committed the robbery. Defendant brought the duffle bags to the front of the SUV, where Ray was sitting, and said nothing. Defendant did not seem surprised nor did he deny that he had been with Pierce.

A few days later Ray had another conversation with defendant and Pierce. Pierce seemed frustrated and said that defendant had run away from the scene and back to his car, which made him appear suspicious to anyone watching. Pierce told defendant that he should not have run because, "You could have got us caught up." Defendant replied, "Yeah, I shouldn't have ran." Ray guessed that when Pierce was inside the store, defendant went to check on him, then ran back to his car and waited for Pierce to come out. Pierce said he would not have done this with anyone else because he trusted his brother, and that defendant "did his thing" which Ray understood to mean that defendant had done a good job. Defendant did not do or say anything that caused Ray to think he disagreed with anything Pierce was saying. Defendant did not deny that he participated or that he was the driver, and he did not seem surprised about what Pierce said.

The day of the AT&T robbery, between 8:00 and 9:00 a.m., Pierce called Ray, seeking Ray's help because he was going into the store and "Gutter" had not shown up. Ray met Pierce at a gas station about two blocks from the AT&T store. Pierce instructed Ray to go in with Pierce, and gave Ray gloves, a hat, sunglasses, and a fake gun. Pierce said that he had been to the store previously to "case it." He also told Ray that defendant would be there, waiting across the street at Panera Bread restaurant with his own car, a

4

Ford Focus, and would pick up Ray and Pierce at the front of the store or on the side in the alley. Ray had seen defendant's car before, but he did not see it that day.

Ray testified that the robbery happened as shown on the surveillance video. He heard sirens just before they left the store and could still hear them once they were outside. The men ran to the area where defendant was supposed to be waiting, but he was not there. Sounding upset and angry, Pierce telephoned defendant, asked him where he was, and told him he supposed to be there. Pierce then told Ray that defendant was not coming, and that they had to run to get away. As they ran they threw the bags of goods under a recreational vehicle, and then separated. Ray was soon caught in the parking lot of the city park. He told Sheriff's Detective Mark Donnel about the robbery and took responsibility for his role. Ray understood the danger of being a "snitch"; and on the bus from jail to the courthouse, Pierce said if Ray went to prison after testifying, it would be bad for him.

After defendant's arrest in late July 2013, Detectives Donnel and Thompson interviewed him. A recording of the interview was played for the jury. Throughout the interview, which lasted about two and a half hours, defendant consistently insisted that that he did not participate in the robberies. Without mentioning Ray, Detective Donnel led defendant to believe that it was Pierce and another man, Brandon Singleton, who had provided information incriminating defendant in the two robberies. Detective Donnel also occasionally claimed to have evidence he did not have in an effort to provoke admissions.

Detective Donnel told defendant that Pierce said defendant had become scared and ran away from the Radio Shack, and that he was supposed to be closer by, but that in the end he stuck by him. Defendant explained that the only time he remembered running near the Radio Shack was the afternoon he gave his brother a ride to the Pyramid Liquor Store. Defendant said "these guys showed up" and he thought they might have been gang affiliated. When told that the robbery took place at 9:00 a.m. and that cell tower pings placed him there, defendant suggested that it might have been one of the three occasions

5

that he had given his brother a ride to the Radio Shack to make a purchase, but he claimed he could not remember running on those occasions.

Detective Donnel told defendant that they had evidence placing his car near the Radio Shack's back exit which showed that when Pierce came out he jumped into defendant's car. The detective said, "Tell me about that day and what happened." Defendant replied: "When, when he came out and he jumped in my car, he had black bags. . . . He had the same, the same black bags from tattoos. Like, I think the day you're talking about is when we were -- we were across the street from -- on Pyramid -- there's the Pyramid gas station and there's a house that's right there. He told me to wait at the house. And I didn't know if he was going in there to do a tattoo. I had a bad feeling about it. I don't know if he was going in there to, uh, to beat this guy up that they happened with the Pyramid. And this is one that was in the morning. This is the one that I kind of don't want to talk about. So he went in, um, to that parking lot. He told me to wait right there and look out if any of those guys came back. So I just sat there. I sat there and I waited and when he came back out, he had his bags and he was, like, go, go, go. So I started running."

Defendant went on to explain that he had dropped off Pierce across Palmdale Boulevard from the Radio Shack sometime before 10:00 a.m. Pierce told Ray to wait there, to watch the nearby house for "those guys." Later in the interview, defendant admitted that Pierce instructed him to "look out for guys and for cops." Defendant saw Pierce walk around the parking lot for awhile. When Detective Donnel told defendant that video cameras had captured Pierce sitting outside the store, defendant replied that he saw Pierce sitting there for no more than two minutes or so, and he did not see Pierce go into the Radio Shack.

Defendant told the detectives that on the morning of the AT&T robbery he took Pierce to Ray's hotel, where he stayed for 30 minutes. Pierce asked defendant about his plans for the day. Defendant replied that he intended to go to the gym in Palmdale and to study. Defendant left in his car and Pierce and Ray left in a separate car. Defendant then drove to the Panera Bread restaurant, located across the street from the AT&T store. He

6

remained there studying for about 45 minutes. Defendant denied knowing that at the same time, Pierce was across the street in the AT&T store, and he denied that Pierce had told him to be there. Defendant claimed he did not know Pierce was in the area until Pierce called him and said he was there. Because of the noise from the sirens, defendant could not hear exactly where Pierce was, so he drove around looking for him and found that the police had everything blocked off. Detective Donnel asked defendant about the chances that defendant would be right near the Panera Bread while Pierce was at the AT&T store. Defendant replied, "He's my brother" and said that Pierce knew his schedule. Defendant suggested that Pierce, knowing defendant would be there, perhaps planned the robbery for that time.

Toward the end of the interview defendant told the detectives that about a week before the first robbery Pierce had said he needed "quick money" and was thinking of doing "some crazy shit." When Pierce told defendant he was going out to buy some gloves, defendant thought he meant tattoo gloves. Pierce said the "tattoo shit" was not working out for him, and he badly needed money. Defendant believed that Pierce meant he was thinking of committing a robbery and told him not to do anything stupid.

Defendant agreed with the detectives that he was in the "perfect look out position" during both the Radio Shack and AT&T robberies. He thought Pierce had put him there, and he should have said something to Pierce prior to the Radio Shack robbery, such as, "whatever you're doing, don't do it." Defendant claimed the AT&T robbery was different because the last time he had seen Pierce that morning was on the other side of town. Defendant explained that Pierce was a smart guy, knew defendant's schedule, and knew if defendant would be nearby.

## DISCUSSION

### I. Substantial evidence

Defendant contends that substantial evidence did not support his conviction as an aider and abettor. He argues that Ray's testimony cannot provide substantial evidence because Ray was an accomplice and his testimony was insufficiently corroborated.

7

The testimony of an accomplice must be corroborated by independent evidence that tends to connect the defendant to the crime without aid or assistance from the accomplice's testimony. (§ 1111; *People v. Avila* (2006) 38 Cal.4th 491, 562-563.) However, corroborating evidence may be slight or circumstantial, and need not amount to substantial evidence. (*People v. Nelson* (2011) 51 Cal.4th 198, 218.) The evidence need not corroborate the accomplice on every fact or establish every element of the offense; it is sufficient as long as it tends to implicate the defendant by relating to some act that is an element of the crime. (*Ibid.*) The jury's determination on the issue of corroboration is binding on a reviewing court. (*People v. Abilez* (2007) 41 Cal.4th 472, 505.) Here, Ray's testimony was corroborated by defendant's own statements to the detectives, as well as cell phone records which showed defendant was near each crime scene with his car and in communication with his brother. We thus include Ray's testimony in our review for substantial evidence.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

"Whether one has aided and abetted in the commission of a crime is a question of fact for the jury to determine from the totality of the circumstances proved. [Citation.] Factors which the jurors may consider in making such determination include presence at the crime, companionship and the conduct of the accused before and after the offense. [Citation.] (*People v. Perryman* (1967) 250 Cal.App.2d 813, 820.) "'[W]hile mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal. [Citations.]' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)

Defendant contends that Ray's testimony was incompetent, unreliable, and lacked credibility; and that the conflicts in his testimony demonstrated that he lied when he implicated defendant. Defendant suggests throughout his analysis that inferences favoring his own credibility should be given more weight because he consistently claimed in his police interview that he did not participate in the two robberies or know that Pierce intended to commit the crimes, and because he gave reasonable and innocent reasons for being in his car near each robbery scene at the very times the robberies were being committed. Defendant provides a lengthy recitation of such facts, and concludes that his conduct was "reasonably consistent with his lack of knowledge of the robbery and lack of intent to aid and abet in the robbery."

Defendant has turned the standard of review on its head. His analysis has been made in the light of the evidence that most favors his position. He has drawn all inferences that reasonably point to his innocence, and he has rejected those which

9

reasonably imply guilt. Indeed, defendant has provided an exhaustive catalog of all the circumstances that he believes might reasonably be reconciled with a finding of innocence, while dismissing as illogical or merely suspicious the circumstances supporting guilt. Further, defendant has resolved all conflicts and credibility issues in his favor, suggesting that the jury could reasonably have done the same and that reversal is required because the jury failed to do so.

The existence of circumstances that might reasonably be reconciled with a finding of innocence does not render the evidence insubstantial. (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.) It was the exclusive province of the jury to resolve credibility issues, conflicts, and inconsistencies in the testimony. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The jury was not required to believe defendant's explanations, and further, could accept in part and reject in part any witness's testimony, including defendant's. (See *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.) Thus, it was for the jury, not the appellate court, to believe or disbelieve some or all of defendant's statements and some or all of Ray's testimony.

Further, although it was the jury's duty to acquit if it found that circumstantial evidence was susceptible of two interpretations, one suggesting guilt and the other innocence, "'the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Our review "'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.'" (*People v. Bassett* (1968) 69 Cal.2d 122, 138.)

Our review of the entire record reveals substantial evidence to support the jury's resolution of such conflicts and defendant's convictions. Defendant's companionship with Pierce and his conduct before and during the robberies provided compelling circumstantial evidence of Pierce's intent to commit the crimes, defendant's knowledge of that intent, and defendant's intent to facilitate the crimes. Not long before the first robbery, Pierce told defendant that he needed "quick money" and was thinking of doing

10

"crazy shit"; and defendant admitted that he understood Pierce to mean that he was thinking of committing a robbery. Defendant admitted he was with his car near the scene of both robberies at the time his brother committed them, and that both times he was in the "perfect look out position." He dropped Pierce off across the street from the Radio Shack sometime before 10:00 a.m., and Pierce instructed him to wait for him there to "look out for guys and for cops." Defendant waited until Pierce came running out of the parking lot with a bag, screaming, "Go, go, go" Defendant admitted that he was across the street from the AT&T store for about 45 minutes, during the precise time that Ray and Pierce were inside taking property.

Defendant's conduct and companionship with Pierce after the robberies continued to implicate him as an aider and abettor. Pierce and defendant were together right after the Radio Shack robbery. Ray testified that when Pierce and defendant visited him that day, Pierce said they had just robbed an AT&T or Radio Shack store. Defendant brought bags from the back of the SUV, and showed Ray iPads, phones, and other such items. Ray understood Pierce to mean that he and defendant had both committed the robbery. Defendant did not seem surprised or deny that he had been with Pierce. A few days later Pierce chastised defendant in Ray's presence, for running in the Radio Shack parking lot. Defendant agreed that he should not have run, but he did not deny that he participated in the robbery; nor did he seem surprised at Pierce's comments. Ray testified that immediately after the AT&T robbery, he and Pierce ran to the area where defendant was supposed to be waiting for them, and when defendant was not there, he overheard Pierce's angry phone conversation, asking defendant where he was. Defendant admitted that Pierce called him when sirens could be heard, and that he drove around looking for Pierce, but was impeded by the arrival of police cars.

We conclude that the jury could reasonably find that defendant aided and abetted Pierce's commission of the robberies of both stores, and that defendant's convictions were supported by substantial evidence.

11

## II. Witness's fear

Defendant contends that the trial court erred in admitting evidence that Radio Shack manager Contreras felt intimidated by the inquiry of the unknown man at the store to which she transferred after the robbery. He contends that the evidence was so prejudicial that his trial was rendered fundamentally unfair and he was denied the right to due process under the United States and California Constitutions. He also contends that the trial court failed to weigh the probative value of the evidence against its potential prejudicial effect.

On the first day of trial, the prosecutor filed motions in limine regarding the admissibility of several areas of evidence, including the incident which had frightened Contreras. The prosecutor argued that the evidence was admissible as relevant to the witness's credibility, subject to the court's balancing under Evidence Code section 352 (section 352). The court found that the evidence was relevant to the witness's credibility, explaining: "The fact that the witness has received this information, that she was frightened and yet still comes into court and sticks to her story, the jury needs to understand that in order to evaluate her credibility."

We discern no failure of the trial court to weigh the probative value of the evidence against its potential prejudicial effect. As defendant was given the opportunity to argue that the evidence was unduly prejudicial, and the trial court's ruling contained an explanation of its probative value, we assume that the trial court did, contrary to defendant's contention, weigh prejudice against probative value. Under such circumstances, the court was not required to expressly balance the two factors on the record. (*People v. Carter* (2005) 36 Cal.4th 1114, 1151-1152.)

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*); see also *People v. Chism* (2014) 58 Cal.4th 1266, 1291-1292; see Evid. Code, § 780.) "An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*Burgener, supra*, at p. 869.)

12

We review the trial court's admission of such evidence for abuse of discretion. *People v. Chism, supra*, 58 Cal.4th at p. 1291.) A trial court's exercise of discretion with regard to the admissibility of evidence "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Defendant contends that the evidence had little probative value because the incident could not be linked to defendant. Defendant argues that there was a significant danger of undue prejudice because the evidence implied that he had a bad character or a habit of intimidating people, when there was in fact no evidence suggesting any intimidation on his part or connected to defendant. The contention is without merit. "[E]vidence that a witness testifies despite fear is important to fully evaluating his or her credibility. [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1086.) It is unnecessary to show that a perceived threat is linked to the defendant, as "[i]t is not necessarily the source of the threat -- but its existence -- that is relevant to the witness's credibility." (*Burgener, supra*, 29 Cal.4th at p. 870.) Further, it is the witness's fear that is relevant to credibility, not whether the fear was caused by specific acts of any persons connected with the trial; thus, evidence of threats or intimidation is not a prerequisite to admissibility. (*People v. Avalos* (1984) 37 Cal.3d 216, 232.)

Defendant suggests that the potential prejudicial effect of the evidence was demonstrated by the prosecutor's argument, in which he "emphasized a theme of intimidation by arguing that even though both Ray and Contreras were threatened, they still testified."[2] We review the trial court's determination under section 352 as of the time of the ruling. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) The

---

[2] The prosecutor pointed out that Ray testified about being threatened by Pierce and although he knew he was in danger, he testified anyway. The prosecutor then said, "And it is the same with Stephanie Contreras. She got threatened by somebody. Somebody went to the Radio Shack and said they were looking for her and she said she was scared about that but she came and testified anyway, even though she was scared and even though that was a threat."

13

prosecutor's argument was not before the trial court at the time of the ruling and thus did not demonstrate potential prejudice.

Under the circumstances, no abuse of discretion appears. In any event, any prejudice was avoided by the trial court's instructions. At the time of the testimony, the trial court instructed the jury that the evidence could be considered only to assess Contreras's credibility. Prior to the prosecutor's argument, the trial court instructed the jury with CALJIC No. 2.09: "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except the limited purpose for which it was admitted." "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) We thus presume that the jurors did not infer from the evidence or the prosecutor's argument that defendant had a bad character or a habit of intimidating people. The prosecutor's argument thus merely constituted fair comment on Contreras's credibility, as prosecutors are given wide latitude during argument to comment on the credibility of witnesses, including the inferences regarding credibility to be drawn from the witnesses' testimony. (*People v. Bonilla* (2007) 41 Cal.4th 313, 337-338.)

Defendant contends that the instructions were inadequate to dispel any prejudice, as the trial court failed to admonish the jury that intimidation evidence should not be attributed to defendant. We note that at the time that Contreras testified and the trial court gave the limiting instruction, defendant did not renew the section 352 objection or object to the wording of the instruction, and defendant does not claim to have suggested any additional language. A trial court has no obligation, "sua sponte, to give a limiting instruction informing the jurors they could consider the evidence of the witnesses' fear in testifying only in assessing credibility." (*People v. Valdez* (2012) 55 Cal.4th 82, 139; see Evid. Code, § 355.) It follows that the trial court was not required sua sponte to add additional language which was never requested or suggested by defendant. Moreover,

14

the testimony and the prosecutor's argument made clear that there was no evidence identifying the older man whose inquiry frightened Contreras and no evidence connecting him to defendant.

Defendant has not established an abuse of discretion in admitting the testimony. Regardless, we agree with respondent that if the trial court had erred, any such error would be harmless under either the standard for state law error set out in *People v. Watson* (1956) 46 Cal.2d 818, 836, or the standard for federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24, as we conclude beyond a reasonable doubt that the result would not have been different had the trial court excluded the testimony. Contreras did not identify defendant or give any testimony implicating defendant. There was nothing in her description of the incident which suggested that defendant was involved in any way with the inquiry. Moreover, defendant's own statements to the police, Ray's testimony, and the cell phone records provided compelling evidence of defendant's guilt, and such evidence would not have been diminished by the exclusion of Contreras's testimony regarding her fear.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

15